BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

DAMALI A. TAYLOR (CABN 262489)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California  94102
    Telephone: (415) 436-6401
    Facsimile: (415) 436-7301
    damali.taylor@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 15-CR-0126-WHA |
| v. | GOVERNMENT'S RESPONSE TO GAITHER'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT (DOCKET NO. 294) |
| DAVID GAITHER, | |
| Defendant. | Court:  Hon. William Alsup |

**ARGUMENT**

**I.**    **Defendant Gaither Cannot Justify His Late Filing**

       Ignoring the briefing schedule set by the Court for more than a month, counsel for defendant Gaither filed his motion to dismiss for outrageous government conduct on Sunday, October 11, 2015—two days before the hearing on the matter.[1]  He has yet to provide any reasonable justification for his extended delay in filing the instant motion.  Rather, on the record during the October 13, 2015 hearing, he lambasted the government's production as the reason for the delay.  In fact, the government produced text messages and e-mails on September 8, 2015.  Counsel for defendant Gaither stated that he received

---

1 Defendant had previously filed a non-substantive motion for joinder on October 6, 2015. (Docket No. 287.)

them September 11, 2015.  The FBI 302s detailing the substance of the UC's interactions with and about Gaither were all produced to the defense before or on August 25, 2015.  Even if the Court credits the defendant's argument that he needed the text messages and emails, it strains credulity that it took him an entire month to review those communications before filing his motion.  Defendants Handl, Rose and Grissett all managed to comply with the Court's schedule.  This is especially true since defendant Gaither fails to cite any text message or e-mail in his motion.  Indeed, in the beginning of his motion (Docket No. 294, at page 2), defendant Gaither asked the Court to excuse his late filing not because of the late disclosure of the texts and e-mails, but because of the floods in South Carolina (which began on October 2, 2015).  He never mentioned the late disclosure until he began arguing on the record in Court.

Notwithstanding the inexcusable lateness of the filing, defendant Gaither's motion should fail on the merits.  For the following reasons, it is frivolous and should be swiftly denied without any further argument.

A.      **Gaither Had Fair Notice of His Involvement via the First Superseding Indictment**

First Superseding Indictment 15-CR-0126-WHA (the "Indictment") charges Handl and Rose, along with nine other defendants, with a variety of crimes.  Count 1 charges Gaither and others with racketeering conspiracy from at least 2011 up through the date of the Indictment, in violation of 18 U.S.C. § 1962(d).  The pattern of racketeering alleged consists of "multiple acts indictable under Title 18, United States Code, Sections 1956 [money laundering and conspiracy to commit money laundering] and 1344 [bank fraud]; and offenses involving dealing in a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846."  Indictment ¶ 6.  Count 3 charges Gaither and others with money laundering conspiracy from at least 2011 through the date of the Indictment, in violation of 18 U.S.C. § 1956(h).  See id. ¶ 14.  Count 132 charges Gaither and others with conspiracy to distribute, and to possess with intent to distribute, 5 kilograms and more of cocaine, from at least March 2014 through the date of the Indictment, in violation of 21 U.S.C. § 846.  See id. ¶ 24.

II.     **An Analysis of the __Black__ Factors Demonstrates that the Motion is Frivolous**

A.      **The Standard for Dismissal is Extremely High**

As the caselaw makes clear, the standard for dismissal due to outrageous government conduct is "'extremely high.'"  United States v. Pedrin, __ F.3d __, 2015 WL 4879850, at *2 (9th Cir. Aug. 17,

2015) (quoting United States v. Smith, 924 F.2d 889, 897 (9th Cir.1991)).  As the Ninth Circuit recently reiterated:

> Dismissals are "limited to extreme cases in which the government's conduct violates fundamental fairness."  United States v. Gurolla, 333 F.3d 944, 950 (9th Cir.2003).  An indictment can be dismissed only where the government's conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice."  United States v. Stinson, 647 F.3d 1196, 1209 (9th Cir. 2011) (quoting United States v. Restrepo, 930 F.2d 705, 712 (9th Cir.1991)).

Pedrin, __ F.3d __, 2015 WL 4879850, at *2; see United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013); United States v. Nobari, 574 F.3d 1065, 1081 9th Cir. 2009); United States v. Holler, 411 F.3d 1061, 1065-66 (9th Cir. 2005) (holding that government misconduct must be "excessive, flagrant, scandalous, intolerable, and offensive" to violate Due Process); United States v. Smith, 924 F.2d 889, 897 (9th Cir. 1991) ("The Government's involvement must be *malum in se* or amount to the engineering and direction of the criminal enterprise from start to finish.  The police conduct must be repugnant to the American system of justice.") (citations and internal quotation marks omitted); United States v. Herrera, 08-CR-0730-WHA, Docket #3521 (Feb. 16, 2011 order denying defendant's motion to dismiss for putative outrageous government conduct) at 2 (quoting Holler and Smith).

Dismissal of an indictment based on outrageous government conduct is not a means of second-guessing executive decisions or expressing displeasure about investigative techniques:

> the due process clause does not give the federal judiciary a chancellor's foot veto over law enforcement practices of which it [does] not approve.  Rather, our Constitution leaves it to the political branches of government to decide whether to regulate law enforcement conduct which may offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically, but which is not antithetical to fundamental notions of due process.

United States v. Simpson, 813 F.2d 1462, 1468 (9th Cir. 1987), quoted in United States v. Hullaby, 736 F.3d 1260, 1263 (9th Cir. 2013).

As government counsel noted on the record, the government is aware of only one Ninth Circuit case where the Court found outrageous government conduct.  Greene v. United States, 454 F.2d 783 (9th Cir. 1971).  That case—a 1971 bootlegging case—has since been impliedly overruled as contrary to current law.  United States v. Haas, slip op, 141 F.3d 1181 (9th Cir. 1998) ("If the category is not empty in this circuit, then only one prior decision of this court arguably is included, Green v. United States, 454

1  F.2d 783 (9th Cir.1971), which may be an entrapment rather than an outrageous government conduct

2  case. Green predates Russell and Hampton, so does not reflect the current law of the circuit on

3  outrageous government conduct.").

4  **B.      With Respect to <u>Black</u> Factor[2] Nos. One and Two, the UC Had Every Reason to**

5  **Believe that Gaither Was Criminally Predisposed.**

6       The first two <u>Black</u> factors – the "known criminal characteristics of the defendants" and the

7  "individualized suspicion of the defendants" – weigh heavily against any finding of government

8  misconduct.  The law does not require that Gaither have a criminal conviction history.  The evidence

9  shows that the UC was introduced to him by his co-defendant Rose.  Rose, the money launderer, brought

10  in Gaither and introduced him to the UC to do money laundering.  Specifically, Rose brought Gaither to

11  an October 9, 2013 meeting with the UC.      Prior to the meeting, it was understood that Rose and the

12  UC would be discussing details of the Las Vegas club laundering scheme and the $50,000 cash down-

13  payment.  The UC had no knowledge of Gaither and received no warning of Rose's intention to bring

14  Gaither to the meeting.  His presence at the meeting was at Rose's invitation and his own volition.

15  There was no government involvement.

16       At first, during the October 9, 2013 meeting, the UC was hesitant to discuss the details of the

17  illegal scheme in Gaither's presence.  (See <u>id</u>. at B-000022.)  As explained in the FBI 302, "Gaither

18  broke the silence by commenting it was fine for UCE to continue since he was 'at the top of the old

19  security clearance' which was confirmed by Rose who added Gaither knows every deal."  At another

20  point, "both Gaither and Rose explained the detail of the operation."  At yet a third point in the

21  conversation, the UC jokingly stated that his client was not comfortable getting mixed up with drugs.

22  Both Rose and Gaither laughed.  Rose added "only pineapples" the code word for drugs.  Finally, as the

23  UC and Rose discussed the UC's illicit check cashing business, Gaither chimed in and explained it to

24

25  ─────────────────────

26  2 Six factors outlined in <u>Black</u> that are "relevant" in determining whether government conduct was "outrageous" are: (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's

27  encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the

28  actions taken in light of the nature of the criminal enterprise at issue.  <u>Black</u>, 733 F.3d at 303 (quoted in <u>Pedrin</u>, __ F.3d __, 2015 WL 4879850, at *3).

1    Rose.  (See id. at B-000021 to B-000025.)  In a subsequent May 13, 2014 meeting between Gaither,

2    Rose and the UC, Gaither engaged in a long conversation wherein he provides advice on how to test out

3    a money courier to see if he was cooperating with law enforcement.  (See id. at B-000033 to B-000038.)

4         It is significant that during that first October 9, 2013 meeting with Gaither, the UC inquired as to

5    how Gaither and Rose met.  They explained that Rose was "highly intoxicated while driving a yellow

6    Viper recklessly" when Gaither, a Myrtle Beach police officer, pulled him over.  Rose failed a sobriety

7    test and became belligerent.  Gaither handcuffed Rose.  However, after Gaither received a call from

8    within his department from a friend of Rose and despite Rose being clearly intoxicated and belligerent,

9    Gaither whispered to Rose that he was getting a "VIP."  Instead of driving Rose to jail, Gaither then

10   drove Rose to a club to join his friends.  This laid the grounds for the UC believing that Rose and

11   Gaither knew corrupt law enforcement since he had clearly been corrupt law enforcement.  (See Handle-

12   Reports-B-000024.)  This point is underscored in a July 15, 2014 exchange between Rose and the UC

13   wherein the UC asks whether Rose knows corrupt law enforcement.  The UC "stressed we need to know

14   for sure the cop is that kind of guy."  The UC also emphasized "we don't want to create that kind of

15   guy."  In response, Rose agreed and commented he knows lots of guys including state troopers who

16   break the law all the time.  When the UC asked in what manner, "Rose said they 'party that shit' with a

17   snorting gesture."  (See id. at B-000055.)  In an August 8, 2014 meeting between Rose and the UC,

18   "Rose said he consulted with David Gaither and they are convinced they know a couple of state troopers

19   who party their asses off and who would be interested.  However, Rose is trying to be very careful in his

20   approach."  (See id. at B-000059.)

21        Gaither's criminal characteristics—i.e., his predisposition—were on display from the very

22   beginning and are therefore beyond dispute.  Based on the above, the UC rightfully had individualized

23   suspicion with respect to Gaither.  He had every reason to believe that Gaither used to be corrupt law

24   enforcement, was willing and eager to be part of a criminal scheme and knew other corrupt officers.

25        **C.    Defendant Has Failed to Demonstrate <u>Black</u> Factor Nos. Three, Four and Five.**

26        The defendant has also failed to make any colorable showing under the third <u>Black</u> factor, "the

27   government's role in creating the crime of conviction."  Defendant Gaither also fails to establish the

28

1   fourth and fifth Black factors, i.e., "the government's encouragement of the defendants to commit the

2   offense conduct," and "the nature of the government's participation in the offense conduct."

3        In addition to the facts recounted above, Gaither's active participation included : 1) suggesting

4   that straw companies acting as consulting firms wouldn't raise red flags; 2) using more straw employees

5   for the no show jobs to make the dollar amounts less noteworthy and to lower the tax implications; 3)

6   confirming that the best part of the mystery shopping ruse was that the real employees would never

7   know they were non-existent; 4) when the topic of the UC's illicit check cashing business came up, Rose

8   did not understand the advantages and Gaither took the lead in explaining the advantages to Rose (See

9   id. at B-000021 to B-000025) ;  and 5) Gaither and Rose agreed that Handl was too undisciplined and

10  discusses too much criminal activity over the phone so they would explain the check cashing business to

11  him in person.  Of course, defendant Gaither has omitted all of these salient facts in his motion.

12       Here, Gaither did not need encouragement and the UC applied no overt pressure or coercion.

13  The UC set a trap and Gaither eagerly jumped on it.  This is perfectly lawful.  "Once the government

14  had set its bait, appellants responded without further inducement by the government."  United States v.

15  Bagnariol, 665 F.2d 877, 882 (9th Cir. 1981), quoted in Black, 733 F.3d at 306.  Given the totality of

16  these circumstances, the defendant's assertion that the Government engaged in outrageous government

17  conduct is simply baseless.

18      **D.**    **Gaither Fails to Meet Any of the <u>Black</u> Factors as to the Narcotics Related Charges**

19       Similarly, the defendant fails to establish any sort of government misconduct relating to the

20  narcotics conspiracy.  As set forth in the government's previous opposition brief (Docket Nos. 266-267,

21  the narcotics conspiracy, thus, was the creation not of the UC, but of Handl—who repeatedly asked the

22  UC for cocaine and brought in several co-conspirators.  Based on his experience with Gaither, the UC

23  inquired as to whether Rose and Gaither knew corrupt officers.  Rose, of course, volunteered that he

24  knew "lots of guys including state troopers who break the law all the time."  Gaither further suggested

25  then- South Carolina State Trooper "David McGaha" for the job and made the arrangements.

26       The case expanded to encompass narcotics trafficking only because Handl persistently asked the

27  UC for cocaine and recruited others into his crime.  Accordingly, the defendant has not established any

28

1  of the <u>Black</u> factors suggesting that there was outrageous government conduct relating to the narcotics

2  conspiracy.

3  **IV.      CONCLUSION**

4         For all of the foregoing reasons, the defendant has failed to present the barest showing of

5  outrageous government conduct.  For all these reasons, his motion to dismiss should be denied without

6  any further hearing.

7

8  DATED: October 18, 2015                    Respectfully submitted,

9                                             BRIAN J. STRETCH
                                              Acting United States Attorney
10

11                                    By:  _____/s/_____
                                           DAMALI A. TAYLOR
12                                         W.S. WILSON LEUNG
                                           DAVID COUNTRYMAN
13                                         Assistant United States Attorneys

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28