IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VLADIMIR HANDL AND OTHERS,<br><br>Defendants.<br>_____/ | No. CR 15-0126 WHA<br><br>**ORDER RE MOTIONS TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT; MOTION FOR DISCLOSURE OF CONFIDENTIAL INFORMANT; MOTION TO PRECLUDE LATE-DISCLOSED DOCUMENTS** |

**INTRODUCTION**

In this eleven-defendant RICO prosecution, several defendants have filed three types of motions. Two defendants, joined by several others, move to dismiss the charges against them based on outrageous government conduct. One defendant, joined by several others, moves for disclosure of the identity of the government's confidential informant. Two defendants move to exclude late-disclosed documents.

**STATEMENT**

The background of this case has been laid out in a prior order (Dkt. No. 241). Essentially, there are three different groups of charged crimes in the superseding indictment. *First*, Counts One through 121 charge defendants Vladimir Handl, Michael Rose, Peter Scalise, PML Clubs, Inc. (which operated a string of strip clubs, night clubs, and restaurants), and David Gaither with racketeering, conspiracy, and offenses related to money laundering and bank fraud. *Second*, Counts 122 through 131 charge defendants Richard Leyland and Edward Hetherton with a separate conspiracy to commit money laundering, substantive counts of money

laundering, and theft of government property.  *Third*, Count 132 charges defendants Handl, Rose, and Gaither, along with defendants Paul Fink, John McGaha, Dominic Grissett, and Richard Bush with conspiracy to possess with intent to distribute cocaine.

A close review of the record reveals the following chronology of events.  Before 2010, an FBI confidential informant reported that defendant Leyland had been engaged in money laundering.  The confidential informant then connected Leyland with an undercover FBI agent, who told Leyland that he needed help laundering some money.  The agent used the story that he represented a client who needed to hide money from a bankruptcy court.  Leyland introduced the undercover agent to defendant Hetherton, who agreed to launder money through his company, Azzure Financial Group.  After Hetherton had completed several transactions with the undercover agent, Leyland got in on the action as well, agreeing to launder more of the undercover agent's money through his own company, Benefit Solutions.  During these transactions, both Leyland and Hetherton took more than their agreed upon percentage from the undercover agent, essentially stealing money from him.

After the undercover agent complained that Leyland and Hetherton had fleeced him, defendant Peter Scalise, Hetherton's brother-in-law, contacted the agent and offered to launder money for him.  Scalise told the agent that his partner, defendant Vladimir Handl, owned several businesses through which money could be laundered.  In late 2011, Scalise, Handl, and the undercover agent met at a P.F. Chang's restaurant in Myrtle Beach.  The three hatched a plan for the agent to make fake purchases of a perishable commodity from Handl's international company, for the company to claim business losses when the commodity allegedly perished, and then for Handl's company to secretly return the money to the agent, with Handl and Scalise taking a cut.  Scalise and Handl created the fake company, with help from the agent, and laundered approximately $300,000 through several transactions in 2012.

As these transactions took place, Scalise and Handl attempted to expand the enterprise, asking the agent if his "client" needed other money-laundering services.  The agent responded that his client had an interest in laundering money from his "pineapple" business (a code word

2

for cocaine).  Handl told the agent he had a friend, defendant Michael Rose, who owned a chain of strip clubs, had been looking for investors, and might be interested.  Separately, Scalise also mentioned Rose as a potential co-conspirator.  After several telephone discussions, Handl arranged a meeting between himself, the agent, Scalise, and Rose in February 2012.  Over the course of the next several months, the parties agreed on a scheme to launder large amounts of putative drug money (approximately $2.3 million) through Rose's several clubs.  Between June 2012 and December 2014, with several gaps of inactivity, the agent gave cash to Handl and Rose, who deposited the money in business bank accounts, provided the agent with fake invoices, and then returned most of the money, taking a cut for themselves.

During this time, Rose also sought investment from the agent in a new club that he planned to open in Las Vegas.  The agent demurred, telling Rose that his client could not openly invest in the club because under Nevada law, investors in clubs seeking liquor licenses had to undergo a background check.  Rose responded that he could fudge the forms, keep the client's investment secret, and return money to the client through false invoices for services that were never performed.  The agent finally agreed and provided $200,000 to Rose, masked as investment in the new club.

Throughout the money-laundering conspiracy, Handl repeatedly asked the undercover agent to supply him with drugs, and the undercover agent agreed to do so in March of 2014.  Handl then introduced the undercover agent to defendant Fink, who agreed to provide his real property as collateral for a loan, so that the group could purchase the drugs from the agent.  Fink, however, lost the money related to the real property transaction and the drug deal stalled.  Almost a year later, in March 2015, the agent agreed to loan Handl and Fink the money so that they could purchase the cocaine.  Handl told the agent that the drugs should be delivered to defendants Dominic Grissett and Richard Bush, his "sales guys."  Handl provided scans of Grissett and Bush's South Carolina IDs to the agent so he would know who to deliver the drugs to. One week later, the agent met with Handl and Grissett to discuss the impending drug transaction.  Handl then agreed to buy fifteen kilograms of cocaine and made an initial cash

payment of $31,000. The undercover agent then met with defendants David Gaither and Rose. Gaither informed the undercover agent that he knew of a police officer, defendant John McGaha, who could provide protection for the drug shipment. McGaha agreed to do so for $5,000. Law enforcement officers then arrested McGaha, who allegedly admitted to his involvement in the scheme.

\*           \*           \*

Now, Handl and Rose move separately to dismiss the charges against them based on "outrageous government conduct." Defendants Grissett, Bush, and Gaither have moved to join these motions. On October 11, two days before the hearing and well after all of the briefing had been submitted, Gaither filed his own error-ridden memorandum in support of his motion to dismiss the indictment. He then withdrew it and submitted a revised memorandum the next day. As stated at the hearing, the government had until October 18 to respond to Gaither's motion, which will be resolved in a separate order.

In addition, defendant Rose filed a motion for disclosure of the identity of the government's confidential informant, which defendants Handl, Grissett, Leyland, Hetherton, Bush, and Gaither joined. Lastly, defendants Handl and Rose have submitted a joint motion to preclude the government's use of late-disclosed discovery.

This order follows full briefing and oral argument.

## ANALYSIS

**1.    MOTIONS TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT CONDUCT.**

"Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed. To meet this high standard, the governmental conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Holler*, 411 F.3d 1061, 1065–66 (9th Cir. 2005). In other words, the government's conduct must be "excessive, flagrant, scandalous, intolerable, and offensive" to violate due process. *Ibid*. The

4

factual defense of entrapment is a separate issue for a jury at trial. To dismiss an indictment based on outrageous government conduct, a defendant must meet an "extremely high standard." *United States v. Garza-Juarez*, 992 F.2d 896, 906 (9th Cir. 1993). "[I]t is outrageous for government agents to engineer and direct a criminal enterprise from start to finish." It is not outrageous, however, "to approach individuals who are already involved in or contemplating a criminal act, or to provide necessary items to a conspiracy. Nor is it outrageous for the government to use artifice and stratagem to ferret out criminal activity." *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (citations omitted). Indeed, there is only one reported decision in which our court of appeals has ever reversed a conviction under this rule. *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). Subsequent to that decision, our court of appeals has stated that *Greene* "may be an entrapment rather than an outrageous government conduct case" and "does not reflect the current law of the circuit on outrageous government conduct." *United States v. Haas*, 141 F.3d 1181 (9th Cir. 1998).

In *Black*, our court of appeals set forth six factors that should be considered when deciding a motion to dismiss for outrageous government conduct:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

*Black*, 733 F.3d at 303. "These do not constitute a formalistic checklist, but help focus our analysis on the totality of the circumstances." *Id*. at 304.

*Black* involved a fictitious stash house robbery which "resulted from an operation created and staged by the ATF." There, our court of appeals' "major concern" was that the government found the defendants in that case by "trolling for targets" at a rough bar in a bad

5

part of town and stressed "[t]he risk inherent in targeting such a generalized population." Additionally, in *Black*:

> The only overt actions by the defendants involved showing up at meetings, including arriving at the parking lot with four hidden, loaded weapons and then driving to the storage warehouse where they were arrested. Although those actions clearly corroborate the defendants' intent to carry out an armed robbery, defendants were responding to the government's script.

*Black*, 733 F.3d at 303. Despite this, *Black* affirmed the convictions and deemed that the government's conduct had not been outrageous.

Here, considering the six *Black* factors, the government's conduct in our case fell shy of conduct "so grossly shocking and so outrageous as to violate the universal sense of justice." *Holler*, 411 F.3d at 1065–66.

The first two *Black* factors, known criminal characteristics and individualized suspicion of the defendants, are similar and shall be considered together. With respect to Handl, he entered the picture by way of an introduction to the undercover agent by Scalise as someone interested in laundering money. Specifically, in a recorded phone conversation with the agent in November 2011, Scalise described Handl's interest in the potential operation as follows (Handl Br.; Exh. B-3): "Somehow it came up and I brought it up and [Handl's] way intrigued and says 'let's go.' So I don't know if that opportunity is still out there, but if it is this guy is solid, solid, solid . . . and it's probably whatever you need." Several weeks later, Handl and the agent met in person, with Scalise, at P.F. Chang's in Myrtle Beach. At the meeting, Handl stated in regards to the proposed money laundering: "you need to tell me — you lay it out and tell me how you need it done." The agent then laid out his client's needs regarding money laundering. Handl seemed interested and eager.

Similarly, Rose connected with the undercover agent through Handl and Scalise, who identified Rose as another potential object of their enterprise. At Rose's first meeting with the agent, he asked the agent to "lay it out for [him]" (Rose Br.; Exh. B-8). While Rose did not

6

affirmatively sign on right then and there, he later agreed to launder the money through his clubs over the next several months.

These introductions provided the FBI with sufficient individualized suspicion and criminal characteristics of both Handl and Rose to continue the investigation. The government's actions were considerably more tame than those *upheld* in *Black*, in which the government agent went "trolling" for unspecified targets at a bar in a bad part of town. Here, in contrast, Handl and Rose came to the agent via their co-conspirators as people already interested in money laundering.

The third *Black* factor addresses the government's role in creating the crime of the conviction. In evaluating this factor, *Black* described the following situation from *United States v. Bagnariol*, 665 F.2d 877, 882 (9th Cir. 1981):

> The government had created the fictional scheme, made the initial contact with persons not known to be actually involved in corrupt political activities, but by baiting a pool of potential candidates for a bribe surfaced these defendants. Any qualms we had about this tactic were mitigated, however, because, once the government had set its bait, appellants responded without further inducement by the government.

*Black* agreed that this government conduct had been permissible. *Id*. at 306.

So too here. In regards to Handl, the evidence seems overwhelming that he persisted as an eager participant in the scheme. He frequently asked the agent for direction and help in how to launder the money, registered the fictitious business, filled out the necessary forms, rented an office, opened bank accounts, and bragged about his criminal connections in Slovakia. Moreover, he repeatedly asked to expand the scope of the scheme by getting further involved in the supposed "pineapple" business and by proposing Rose as someone who could help the group launder larger amounts of money through Rose's cash-heavy strip clubs.

While Rose did not match Handl's eagerness in constantly requesting to expand the scheme, the lengthy recordings of his phone conversations and in-person meetings clearly show

7

that he appeared to be an instrumental and willing participant. Rose specifically noted the benefit that the cash nature of his clubs could provide and encouraged the agent's investment in his new Las Vegas club. Furthermore, when considering the scheme at the first meeting, Rose noted that he understood the conspiracy would be "highly illegal" and negotiated for a 12% cut of a specific transaction, rather than the 10% proposed by the agent (Rose Br. at 8; Exh. C). In addition, Rose acquiesced casually when requesting information about the agent's client (Fisher Decl. at ¶5):

> ROSE: Are these "High Times" [a magazine devoted to the legalization of cannabis] executives or is this the mob?
>
> AGENT: These are Colombians who import from –
>
> ROSE: [Interrupts] So it's the mob. Ok, that's fine.

As in *Bagnariol*, quoted approvingly by *Black*, Rose responded to an opportunity once the government had "set its bait." *Bagnariol*, 665 F.2d at 882.

On the fourth factor, *Black* stated: "The extent to which the government encouraged a defendant to participate in the charged conduct is important, with mere encouragement being of lesser concern than pressure or coercion." *Black*, 733 F.3d at 308. In his motion, Handl concedes that the agent did not apply "overt pressure or coercion" and states that any pressure put on him had been subtle. Similarly, Rose makes no claim of any overt pressure or threats by the agent.

In fact, the agent provided Handl and Rose with ample opportunity to exit the enterprise. Specifically, the following in-person conversation took place between the agent, Handl, and Scalise in January of 2012, before any money had been laundered (Fisher Decl. at ¶5):

> AGENT: If you guys at any point are uncomfortable with the risk, that's cool with me. I don't want to make anyone do anything they are not comfortable with.

8

>HANDL: No, no, I just want to be on the same page with everyone, that's all.
>
>SCALISE: Right, and we share the risk, right? So it's one of those things that, you know, we're going it [unintelligible] prosper.
>
>AGENT: Oh yeah, we are sharing the risk, if it goes bad, it's gonna go bad. I don't think — I think it is been — it's relatively simple, I guess.

Moreover, the agent had the following in-person conversation with Rose (Fisher Decl. at ¶5):

>AGENT: I just wanted to make sure if you have — all I want are people who want to do it and if for any reason. . . .
>
>ROSE: It will just take one transaction to kinda, you know, "hey are we going to meet and do our thing?" It will just take that one time, you know what I mean?
>
>AGENT: Yeah, all I am saying is I don't want you to feel like you jumped on a train you can't get off. I am the guy who can stop that train.
>
>ROSE: Yeah, if I want to be done with it, I want to be done with it. That's fine.
>
>AGENT: The same way, if you want out, you let me know. If you decided this is not what you want, you let me know.
>
>ROSE: Yeah, yeah, I'm fine. Yeah, no problem. That's fine.

These conversations, recorded via the agent's on-person wire, demonstrate not only a lack of pressure or coercion, but opportunities for Handl and Rose to get out. Instead, they continued on with the conspiracy.

9

In this respect, the facts of our case differ significantly from those in *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), the only decision from our court of appeals ever to dismiss an indictment based on outrageous government conduct. *Greene* involved an invented bootlegging operation set up by the government. There, our court of appeals stressed that:

> [The undercover agent] applied pressure to prod [defendants] into production of bootleg alcohol. The government concedes that [the undercover agent] made the statement, "the boss is on my back." And we believe that in the context of criminal "syndicate" operations, of which [the undercover agent] was ostensibly a part, this statement could only be construed as a veiled threat.

*Id*. at 787. No such pressure or threats were made in our case.

The fifth *Black* factor relates to the government's participation in the crime. *Black* concluded that the "duration of the government's participation in a criminal enterprise is significant, with participation of longer duration being of greater concern than intermittent or short-term government involvement." *Black*, 733 F.3d at 308. Here, the government's participation lasted for over three years. In *Greene*, where the government's participation also lasted three years, our court of appeals found this to be "of extremely long duration." *Greene*, 454 F.2d at 786. Moreover, the undercover agent actively participated in our case. He provided much of the direction, the funding, and spoke and met with defendants on a regular basis. As described above, however, Handl and Rose embodied willing and eager participants and a review of the recorded conversations shows that all three were heavily involved in the conspiracy. While this order finds the duration of the government's participation in this case of most concern, this alone is not sufficient to warrant dismissal of the indictment.

The sixth and final *Black* factor concerns the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue. In *Black*, our court appeals noted that "stash house robberies are largely unreported crimes that pose a great risk of violence in residential communities." *Black*, 733 F.3d at 309. While this risk of violence has not presented itself in our case, money-laundering conspiracies typically involve

10

layers of complex steps and Handl and Rose seemingly attempted to cover their tracks. Moreover, in *United States v. So*, 755 F.2d 1350 (9th Cir. 1985), our court of appeals affirmed money-laundering convictions, despite the defendants' assertion that the government's undercover involvement had been outrageous, and without any mention of this type of undercover operation being inappropriate in the money-laundering arena. In its response, the government asserted that money laundering "requires an undercover operation to uncover" and discovering this type of scheme would have otherwise been "impossible" (Opp. at 12). This is certainly an overstatement and defendants rightly point out that the government regularly thwarts money-laundering plots without this level of undercover intervention. This order finds, however, that this type of undercover involvement is not *per se* outrageous in money-laundering schemes and our court of appeals has never dismissed an indictment for outrageous government conduct in a money-laundering case.

Handl and Rose argue that the FBI's actions in investigating their case constituted outrageous government conduct for a multitude of reasons. Handl asserts that he had no criminal history and thus the government had no reason to suspect him. He also contends that he presented as a novice, did not understand the scheme, constantly displayed his "naivete," and that the undercover agent essentially preyed on him (Br. at 19). Moreover, Handl argues that the government engineered the scheme from start to finish and that the duration of the government's engagement is especially concerning, as described above.

Specifically, Handl stresses an exchange between the agent and Scalise that occurred in late 2011, in which Scalise stated that he had to "make this happen soon with [Handl] or I'm going to lose him and he's going to go take a job being a tennis pro down in Miami. Because he's a tennis pro. He's got an offer for, like, 250 a year to go down to Miami and teach tennis" (Handl Br.; Exh. B-5 at 20–21). Handl asserts that at this point, instead of continuing to reach out to Handl to gauge his interest, the agent should have simply left him alone.

Rose, similarly, argues that he had no criminal history, an unblemished record, and that the government improperly enticed him to engage in the criminal conspiracy. He also points to

11

the extent of the government's involvement in the scheme from start to finish along with its duration. At oral argument, Rose emphasized that he did not affirmatively agree to join the conspiracy at the outset and had to be convinced by Handl, over a two-month period, after prodding from the agent. In a conversation between Handl and the agent, Handl stated that Rose "was very concerned about putting all of his clubs, you know, at risk" (Rose Br.; Exh. B-12). Several weeks later, the agent asked Handl for an update on Rose, stating "if [Rose] is on board with that, that's all I'm asking, if [Rose] is on board, we can probably still do this" to which Handl responded "he hasn't said yes or no" (Rose Br.; Exh. B-16).

A week later, Scalise proposed that the group assemble for a face-to-face meeting. This took place in late April of 2012. During the four-hour meeting, the group discussed the contours of the scheme and Rose expressed interest. Moreover, Rose clearly understood the illegal nature of the proposal, stating "if the bank catches on to something, anything could happen" and asked about the agent's client, "are these guys good guys, or are these guys probably going to shoot somebody?" Furthermore, Rose pressed on with his suggestion that future secret meetings take place in hotel rooms rather than in the clubs themselves (Rose Br.; Exh. B-20). At this point, before any money laundering had occurred, the agent specifically told Rose "I don't want you to feel like you jumped on a train and you can't get off. I'm the guy who can stop that train." Rose told the agent he wanted to stay on the train, stating: "Yeah, if I want to be done with it, I want to be done with it. That's fine" (*ibid*).

Handl and Rose depict themselves as innocent and naive saps preyed upon by a government bully. The record, however, shows otherwise. As demonstrated by the voluminous recordings, Handl and Rose were eager participants, came up with a significant amount of the strategy, created fictitious companies, filled out false invoices, and showed little doubt about their commitment to the criminal enterprise. Rather than being threatened or coerced into joining, the undercover agent provided opportunities to "stop that train." Handl and Rose continued to ride (and profit). Handl regularly attempted to expand into the "pineapple" business (as he eventually did), and Rose pushed for investment in his new club in Las Vegas.

To be sure, the Court is bothered by the fact that the entire multi-year criminal enterprise constituted a fiction from the beginning. One can rightly ask whether the FBI should be out solving real crimes already committed by real criminals rather than encouraging innocents to commit manufactured crimes. Nevertheless, a close review of the record does not show the government's conduct to be "so grossly shocking and so outrageous as to violate the universal sense of justice." *Holler*, 411 F.3d at 1065–66. As stated above, our court of appeals has only once dismissed an indictment based on outrageous government conduct. It is an extreme remedy. The government's manipulation in this case simply did not rise to that extreme level. Defendants' motions to dismiss the indictment based on outrageous government conduct are **DENIED**.[*]

In addition, Handl and Rose argue that the further drug conspiracy charge (Count 132) should be dismissed based on the same theory. By the time the drug conspiracy began, Handl and Rose were already well into the money-laundering phase of the enterprise. Therefore, the government agent had clear individualized suspicion as to Handl and Rose's propensity for criminal activity. With respect to Handl, the record reveals that he regularly asked the agent about the "pineapple" business, recruited others to join once the drug conspiracy began, and eagerly agreed to purchase large amounts of cocaine. Rose, while not a central participant in the drug conspiracy, still participated by recruiting a police officer (McGaha) to provide protection for the drug purchase. Handl and Rose offer no evidence suggesting that the government's actions in acceding to Handl's regular requests for drugs amounted to conduct "so shocking to due process values that the indictment must be dismissed."

Lastly, defendants assert that as an alternative, the indictment should be dismissed under the Court's supervisory powers. For the same reasons described above, those motions are **DENIED**.

---

[*] The Court reserves the authority, after hearing all the trial evidence, to grant relief based on the greater evidentiary record.

13

### 2. MOTION TO PRODUCE THE NAME AND LOCATION OF THE GOVERNMENT'S CONFIDENTIAL INFORMANT.

Defendant Rose, joined by defendants Handl, Grissett, Leyland, Hetherton, Bush, and Gaither, has filed a motion for disclosure of the name and location of the government's confidential informant. Alternatively, the motion requests a pre-trial interview between the attorneys and the informant, outside of the presence of defendants. Rose argues that the confidential informant's identity is important to the entrapment defense he intends to present at trial.

The government responded that it plans to identify the informant, who will testify in its case-in-chief, with its *Giglio* disclosures and witness list, which are due by December 23 of this year (roughly seven weeks before the first trial date). Moreover, the government asserts that the informant is of minimal relevance to the defendants who are set for trial on February 9 (Handl, Rose, Scalise, PML, and Gaither). The informant's only role in the case consisted of connecting Leyland with the undercover agent. Leyland then introduced the agent to Hetherton, who introduced him to Scalise, who introduced him Handl, who introduced him to Rose. Thus, the government argues, the informant is only minimally and tangentially related to Rose's case.

The government's proposal to identify the informant to defense counsel (but not to defendants themselves) on December 23, seven weeks before trial, is sufficient. The informant's identity may be made available by counsel to defendants themselves three weeks before trial. Defense counsel have not made a sufficient showing that an earlier disclosure is warranted. If defense counsel request it in writing on or before December 23, the government must make the informant available for a pre-trial interview with the requesting attorneys and their investigators, outside of the presence of defendants. If requested, this interview must be completed by **DECEMBER 30, 2015**.

### 3. MOTION TO PRECLUDE THE GOVERNMENT'S USE OF LATE-DISCLOSED MATERIALS.

Defendants Handl and Rose have submitted a joint motion to preclude the government's use of late-disclosed discovery. The final scheduling order stated the following (Dkt. No. 101):

14

> By **AUGUST 25, 2015**, all materials required under Rule 16 to be produced by the government must be produced to any defendant that has made a written Rule 16 request. Any defense request under any aspect of Rule 16 must be made in writing and no later than **JULY 21, 2015**. All such Rule 16 materials acquired after August 25 by the government or any of its agents subject to Rule 16 must be produced within **FOURTEEN CALENDAR DAYS** of receipt or acquisition by government counsel or its agent (but, again, only to a defendant who has made a timely written request). Failure to so produce will preclude use of any such evidence by the government (other than for impeachment or rebuttal). As to any such Rule 16 material produced after August 25, the burden shall be on the government to demonstrate compliance with the fourteen-day exception.

Rule 16(a)(1)(B) states that the following information is subject to disclosure:

> (B) *Defendant's Written or Recorded Statement*. Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing, all of the following:
>
> > (i) any relevant written or recorded statement by the defendant if: statement is within the government's possession, custody, or control; and
> >
> > the attorney for the government knows—or through due diligence could know—that the statement exists;
> >
> > (ii) the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent; and
> >
> > (iii) the defendant's recorded testimony before a grand jury relating to the charged offense.

Despite this, the government produced several rounds of documents after the August 25 deadline, only after prodding from defense counsel. After defendants filed their motion, the Court asked defense counsel to state with specificity the extent to which they "already had

possession, custody, or control of the documents, communications, emails, and text messages that the government produced after the August 25, 2015 Rule 16 deadline" (Dkt. No. 288).

From what can be gleaned from defense counsel's responses, the categories of late-disclosed documents are as follows (Morgan Decl; Dkt. No. 299).

- 220 pages of DEA reports concerning a separate, later investigation that included Handl.

- 68 pages of text messages and 88 pages of emails between the government and Scalise.

- 330 pages of text messages between the government and Rose.

- 20 pages of text messages and emails between the government and Fink.

- Eight pages of text messages between the government and Gaither.

- 135 pages of text messages and emails between the government and Hetherton.

- 203 pages of text messages and emails between the government and Leyland.

- 477 pages of text messages between the government and Handl.

In regards to the late-disclosed FBI documents, the government admits that it "screwed up" (Opp. at 10). The government's excuse is that in 2012, the FBI switched to a computerized document management system called "Sentinel" from a paper-based system. Thus, because the switch occurred in the middle of the investigation, many of the documents got lost in the shuffle. The government states that this case involves a voluminous amount of discovery that it

16

simply could not handle. Furthermore, the government asserts that defendants have not been prejudiced by the late disclosure.

The DEA materials (from the separate South Carolina investigation) will be excluded. The government has no valid excuse for the late-disclosure of those documents. The government, therefore, will be precluded from introducing any of the late-disclosed DEA materials at trial in our case.

As to the FBI materials, the Court will wait and see how many more "errors" arise before ruling. Meanwhile, defense counsel on this motion must make a clear-cut showing that he or she has actually been prejudiced by the government's delayed disclosure. As to each specific late-disclosed document counsel believe has caused prejudice, that counsel must file a declaration from themselves and from their client stating that they did not already have the information in the document. Each counsel and defendant so moving must do this and they may not simply join in the filings by others. This must be done by **NOVEMBER 7, 2015**. Gaither's untimely motion will be considered timely due to its having been based on the late production (and will be ruled on separately).

## CONCLUSION

The motions are granted or denied to the extent stated herein.

**IT IS SO ORDERED.**

Dated: October 19, 2015.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE