1   NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

2   SOLOMON L. WISENBERG, ESQ., DC Bar No. 464867
3   DAN MCCOY, ESQ., SC Bar No. 80128
    101 Constitution Avenue, N.W., Suite 900
4   Washington, D.C. 20001
    Telephone: 202.689.2922
5   Attorneys for Defendants (Pro Hac Vice)
    Michael Rose

6
    THOMAS H. BIENERT, JR., ESQ.
7   CA BAR No. 135311
    Bienert, Miller and Katzman, PLC
8   903 Calle Amanecer
    Suite 350
9   San Clemente, CA 92673
    Telephone: 949.369.3700
10  Attorney for Defendants
    Michael Rose
11

12
                    **IN THE UNITED STATES DISTRICT COURT**
13              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                        **SAN FRANCISCO DIVISION**
14

15  **UNITED STATES OF AMERICA,**            )
                                             )
16                          **Plaintiff,**   )   **No. 15-CR-0126-WHA**
                                             )
17      **vs.**                              )   **DEFENDANT MICHAEL ROSE'S**
                                             )   **SENTENCING MEMORANDUM**
18  **MICHAEL ROSE, et al.,**                )
                                             )   **Date: May 31, 2016**
19                                           )   **Time: 2:00 p.m.**
                                             )   **Court: Hon. William Alsup**
20                          **Defendants.**  )
                                             )
21                                           )
                                             )
22                                           )
                                             )
23

24

25

26
                        MICHAEL ROSE'S SENTENCING MEMORANDUM
                        No. 15-CR-0126-WHA

TO THE HONORABLE WILLIAM ALSUP, U.S. DISTRICT COURT JUDGE FOR THE NORTHERN DISTRICT OF CALIFORNIA

## I.   INTRODUCTION.

Michael ("Mike") Rose is a fundamentally good man. Through hard work and a natural bent for business, he turned himself into a successful entrepreneur with a chain of nightclubs up and down the East Coast. Mike was legendary within the Gentlemen's Club industry for ethical integrity toward colleagues, fair dealing with entertainers, and extraordinary concern for his employees. He also donated time, money, and organizational skills to raise thousands of dollars for local charities, created jobs in the community, and diligently guided his children onto the right path. Mike had a loving family, friends, and hundreds of employees who considered him as much of a father as a boss. Yet for three years—years in which he delivered gifts and hot meals to hundreds of disadvantaged children at Christmas, organized and financed a huge buffet lunch for first responders, and paid out of his own wallet to keep multiple employees from going homeless—Mike, at first reluctantly, but then all too willingly, participated in what he thought was a money laundering operation. His idyllic world came to an abrupt end on March 18, 2015, when he was arrested in the middle of the night for his involvement in this crime.

The Court is obviously aware of the salient facts in this case. But when a federal judge is called upon to sentence a defendant whose crime represents a clear departure from an otherwise law-abiding life, he typically wants to know who the defendant is and why the defendant ended up before him.

Among other things, Mike Rose was and is: the hardscrabble teenager who went to work at age 15 to support his struggling parents; the successful entrepreneur, who served as mentor, father figure and unsung benefactor to generations of young employees; the single dad who

rescued his oldest son Matthew from an unsafe environment, raising him to be a fine young man; the dutiful son who kept his mother from a life of drudgery, allowing her to retire in peace and comfort; the responsible ex-husband who financially contributes to his ex-wife's household in order to ensure a stable environment for his 13 year old son; the organizational whiz-kid who raises enormous funds for charity at the drop of a hat; the humble servant, visiting old friends in their hours of need; and the loving husband and emotional backbone of his young family.

As to why Mike is before the Court, the answer is fairly simple. A 45 year old citizen with an unblemished record and pressing financial problems was persuaded by undercover Government agents, over a two month period, to join what he thought was a money-laundering conspiracy. Michael Rose was good but imperfect and allowed himself to be enticed into criminality. No, he was not entrapped. Yes, he absolutely knew what he was doing and entered into the charged enterprise with eyes wide open. But one thing is clear; absent Government involvement, Mike Rose would never have crossed the line into criminal conduct.

The Court has noted that it is "bothered by the fact that the entire multi-year criminal enterprise constituted a fiction from the beginning. One can rightly ask whether the FBI should be out solving real crimes already committed by real criminals rather than encouraging innocents to commit manufactured crimes." (October 19, 2015 Order, Dkt. No. 304.) The substantive and temporal extent of the Government's involvement in these crimes, and the lengths Government agents went to in ensnaring Mr. Rose, are remarkable. Every dollar that Mike laundered was provided by the Government. Every delivery was made by Government agents. Every "pineapple" and "client" he discussed was imaginary. Every request that Mike locate law enforcement "security" to protect future drug deals was prompted by the

Government. The Government did not prevent any crimes from happening here. To the contrary, the Government affirmatively orchestrated the crimes—each and every one. The Government helped turn Mike from a decent, hardworking, job-creating, tax-paying, law-abiding citizen into a criminal.

But we are not requesting that the Court use Mike's sentencing as a platform to issue a policy condemnation against the Government for creating and prosecuting imaginary crimes against its own citizens. Nor do we ask that the Court grant Mike leniency solely out of any distaste it may have for the scope of the Government's behavior. That the entire operation was a Government production does not change Mike's belief that he was laundering dirty money or Mike's knowledge that his acts were illegal. But we do submit that the extraordinary circumstances surrounding Mike's crimes, and the Government's actions as they relate to Mike, are relevant to Mike's sentencing because they inevitably affect the value judgments one must make about the extent of Mike's culpability. The Government's involvement here also highlights the inapplicability of the four factors at the heart of current sentencing jurisprudence—to wit, punishment, deterrence, societal protection and reparation—to Mike's situation.

In short, the nature of Mike's involvement, the full circumstances surrounding of these crimes, and Mike's personal character render the sentencing of Mike Rose a relatively unique case which cries out for the more flexible approach allowed in the current sentencing era. Mike's complete lack of criminal history and minimal risk of recidivism; the emotional and financial stress Mike was under when the undercover agent presented with him an opportunity to make quick and easy money; Mike's reluctance to commit to the enterprises in the face of the undercover agent's continued pressure; the absence of any victim whatsoever; Mike's

obviously limited, last-minute participation in an imaginary drug deal; and the ability of the Government to manipulate the size and amount of cash deliveries over a nearly three-year interval in order to enhance Mike's Advisory Guideline sentencing range are all relevant factors that we submit the Court should consider in determining a sentence which will be "no greater than necessary to achieve the purposes of the sentencing factors." These circumstances establish that an appropriate sentence for Mike, in the particularized circumstances of this case and the character of this defendant, is a sentence of time served.

Mike in no way wants to excuse or gloss over his conduct. He knows he has made a huge mistake that will forever change his life, the lives of his children, and the prospects for the countless people he has helped over the years. Mike will forever be a felon and will never again enjoy the luxuries he once did as a successful businessman. Mike says:

> This profound misstep I took in life has caused my loved ones much disappointment and pain. I've asked myself many times, how could I have lived teaching my children the difference between right and wrong, and the consequences of immoral actions, then find myself learning from the exact lessons I taught them. It's a mistake that is hard to swallow and one that I must live with for the rest of my life. I realize that no matter how it started, whether real or not, I let down the very community that supported me.

There are, however, several salient factors, in addition to the above-mentioned circumstances surrounding the offense, warranting a downward variance to a sentence of time served in Mike's case. These factors include:

• Mike's lengthy history of good character, humility, and good works, including his substantial community service and financial support to hundreds;

• Mike's exemplary and deeply involved role as a husband, father, and son;

• Mike's deep remorse and acceptance of responsibility for his actions;

- The significant stigma and suffering that Mike will face for the rest of his life by virtue of being branded a felon;

- The suffering and shame that Mike, a prominent businessman in a small community, has already endured by virtue of the extensive media coverage of his indictment and arrest;

- Mike's first offender status;

- The victimless nature of the crime;

- Mike's proven ability to earn income and establish successful businesses in his community;

- The enormous circle of family and friends willing to emotionally and financially support Mike during a period of supervised release;

- The sentences of similarly-situated defendants nationwide;

- Mike's acceptance of responsibility and truthful debriefing with the Government;

- Mike's health concerns and the need for him to provide medical care to his children and parents.

This Memo will explore these factors, following a discussion of the governing principles of sentencing, and this Court's broad sentencing discretion under the current sentencing regime. Notwithstanding Mike's life history of good character and good works, and the Government's involvement in creating the crimes at hand, Mike faces a possible draconian sentence, due in part to an Advisory Guidelines Range based on mathematically rigid and empirically dubious loss-based formulas.

Mercifully, in the wake of *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), this Court can and should impose a more humane sentence, a sentence of time served. This case is a unique opportunity for the Court to consider the entire available spectrum of sentencing factors and options under the advisory Guidelines in order to impose a just sentence on a decent man who went astray at the Government's urging.

## II.   GOVERNING PRINCIPLES.

As the U.S. Supreme Court established in *Booker*, *Gall*, and *Kimbrough*, a sentencing Court has broad discretion to consider nearly every aspect of a particular case (and a particular defendant) in fashioning an appropriate sentence. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). It is axiomatic that *Booker* rendered the U.S. Sentencing Guidelines ("Guidelines") advisory rather than mandatory. *United States v. Booker*, 543 U.S. 220, 264 (2005). In *Gall*, the Supreme Court took pains to point out that 18 U.S.C. § 3553(a)(3) "directs the judge to consider sentences other than imprisonment." *Gall*, 552 U.S. at 59.

Federal appellate review of district court criminal sentences is now limited to determining whether they are reasonable. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). The *Gall* Court held that an appellate court reviewing a sentencing decision may not presume that a sentence outside the Guideline range is unreasonable. In fact, "in reviewing any sentence, 'whether just inside, just outside, or significantly outside the Guidelines range,'" federal appellate courts generally apply "a 'deferential abuse-of-discretion standard.'" *United States v. Barsumyan*, 517 F.3d 1154, 1157 (9th Cir. 2008) (quoting *Gall*, 552 U.S. at 41). This is so, among other things, because of the institutional advantages and insights (often not conveyed on the record) that district courts enjoy with regard to sentencing matters. *United States v. Autery*, 555 F.3d 864, 872-73 (9th Cir. 2009).

The *Kimbrough* court stressed that the sentencing judge is not bound by the Guidelines or Guidelines Policy Statements; rather, he may make his own policy judgments, even if those judgments are different than those provided for in the Guidelines. *Kimbrough*, 552 U.S. at 101; *see also Spears v. United States*, 128 S.Ct. 840, 842 (2009). Under *Booker*, a sentencing court must consult and consider the applicable Guidelines range, but is now permitted "to tailor the sentence in light of other statutory concerns as well, see § 3553(a)." *Booker*, 543 U.S. at 245. The primary federal statutes governing sentencing in the federal district courts are 18 U.S.C. § 3553(a) and 18 U.S.C. § 3661.

Section 3553(a) contains an introductory portion and seven subsections. The introductory portion directs the sentencing court, in determining a particular sentence, to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines; (5) Guidelines Policy Statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution. The introductory portion of § 3553(a) also directs the sentencing court to "impose a sentence sufficient but not greater than necessary" to comply with the purposes of that statute's subsection (2). Indeed, this is the overarching goal in federal sentencing. *Freeman v. United States*, 564 U.S. 522, 529 (2011); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

Notably, § 3553(a)'s sufficient-but-not-greater-than-necessary clause sets an independent and certain limit on the sentence that a court may impose to meet the goals of sentencing: retribution, deterrence, incapacitation, and rehabilitation. *See, e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1009 (9th Cir. 2010); *accord United States v. Kikumura,* 918 F.2d 1084, 1111 (3d Cir. 1990) (characterizing the command as a statutory duty to impose a "minimally sufficient" sentence); *States v. Terrell*, 696 F.3d 1257, 1263 (D.C. Cir. 2012) ("The district court's statement that a 188-month sentence was 'just as serious' as a 210-month sentence [] calls into question whether the court believed the 210-month sentence it ultimately imposed was truly 'sufficient, but not greater than necessary,' [under § 3553(a)]."); *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (explaining that a district court evaluating a variant sentence request should consider all relevant § 3553(a) factors as a group and strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing"). However, when determining whether to sentence the defendant to a term of imprisonment or how long that term may be, courts "shall consider all the purposes of punishment except rehabilitation—because imprisonment is not an appropriate means of pursuing that goal." *Tapia v. United States*, 564 U.S. 319, 328 (2011) (applying 18 U.S.C. § 3582).)

Of crucial importance, 18 U.S.C. § 3661 makes it clear that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." The court may even enter sentencing variances based on factors already taken into account by the Guidelines if the "the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a)

considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (quotation omitted); *see also United States v. Richart*, 662 F.3d 1037, 1052 (8th Cir. 2011). Put simply, in addition to the § 3553(a) sentencing factors, the court may receive and consider *any* information concerning the defendant's background, character, and conduct in imposing a sentence. The Supreme Court recently highlighted the centrality of this concept: "In particular, we have emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citations omitted).

Case law is also clear that good works (and the good character such works represent), both exceptional and non-exceptional, whether performed pre- or post-indictment, are valid bases for a *Booker-Gall-Kimbrough* downward variance. *See United States v. Warner*, 792 F.3d 847, 857 (7th Cir. 2015) ("A defendant's record of charity may justify a lenient sentence. . . . [T]o survive appellate review, a defendant's good works must be sufficient to justify the variant sentence, but they need not necessarily be exceptional."); *see also United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013); *United States v. Tomko*, 562 F.3d 558, 560 (3rd Cir. 2009); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008). Under the *Booker-Gall-Kimbrough* line of cases, the Court must consider such good deeds and is free to give them whatever weight it deems appropriate.

Appellate courts across the country have accordingly upheld significant downward variances predicated on various § 3553(a) factors, including for family and mental-health

related reasons. In *United States v. Cole*, for example, the Eighth Circuit recently affirmed a district court's decision to downwardly vary from a Guidelines range of 135-168 months imprisonment to probation. 765 F.3d 884, 886 (8th Cir. 2014). There, the criminal defendant was convicted for her role in a fraud and tax evasion scheme that stole approximately $33 million from the electronics retailer Best Buy over a four year period. *Id.* This scheme the sentencing court described as "one of the largest corporate frauds in Minnesota history." *Id.* Yet the Court of Appeals upheld the district court's sentence of probation because the defendant "had no prior contact with law enforcement," was not "a consummate fraudster, [or] a pathological liar," and a probationary sentence would allow the defendant to work and earn money to make restitution to the victims of the fraud. *Id.*

Similarly, in *United States v. Sayad*, 589 F.3d 1110 (10th Cir. 2009), the sentencing court calculated Sayad's sentencing range for her drug trafficking offense at the Guidelines maximum of 60 months based on her PSR. Nevertheless, the sentencing court imposed, and the Tenth Circuit affirmed, a sentence of five years' probation, citing the § 3553(a) factors, and noting Sayad's "supporting and loving family," the "necessity for [Sayad] to be with her family considering her father's health and their ability to survive, if not prosper, in the very demanding business of running a restaurant," Sayad's naiveté and immaturity, Sayad's expression of anguish over her criminal conduct, her good physical health, her lack of any substance abuse history, and the potential for her rehabilitation outside of imprisonment. *Id.*, 589 F.3d at 1114-15.

Analogous decisions that affirm, and pay significant deference to, downward variances based on § 3553(a) factors are legion. *See, e.g.*, *United States v. Howe*, 543 F.3d 128, 130 (3d Cir. 2008) (affirming downward variance from Guidelines range of 18 to 24 months'

imprisonment to probation on account of defendant's role as a "devoted husband, father, and son," and because defendant made an "isolated mistake" and was "remorseful at sentencing"); *United States v. Baker*, 502 F.3d 465, 469 (6th Cir. 2007) (affirming downward variance from Guidelines range of 27 to 33 months' imprisonment to probation because of defendant's role in caring for her ill son and defendant's remorse); *United States v. Husein*, 478 F.3d 318, 335 (6th Cir. 2007) (affirming a "99.91% variance" to probation because defendant shared responsibility with her mother for caring for her father); *United States v. Wadena*, 470 F.3d 735, 738 (8th Cir. 2006) (affirming downward variance from a Guidelines range of 18 to 24 months' imprisonment to five years of probation in light of the defendant's medical condition and the defendant's dependent child); *United States v. Flowers*, 946 F. Supp. 2d 1295, 1298 (M.D. Ala. 2013) (sentencing defendant to probation despite a Guidelines range of 8 to 14 months' imprisonment because the defendant suffered from untreated psychiatric disorders which affected her judgment and decision-making faculties); *United States v. Lovato*, 798 F. Supp. 2d 1257, 1259 (D.N.M. 2011) (imposing probation notwithstanding a Guidelines range of 21 to 27 months' imprisonment because defendant suffered from mental illness and a traumatic childhood in which she was beaten by her father); *United States v. Davis*, No. 07 Cr. 727, 2008 U.S. Dist. LEXIS 44030, at *1, 18 (S.D.N.Y. June 6, 2008) (rejecting the Guidelines sentencing range of 18 to 24 months' imprisonment and, based on the § 3553(a) factors, sentencing the defendant to "time served, supervised release, and 200 hours of community service"). The district court is free under *Kimbrough* to vary from the Guidelines based solely on policy considerations, including disagreement with the Guidelines. *United States v. Carper*, 659 F.3d 923, 925 (9th Cir. 2011).

Several recent cases from the U.S. Court of Appeals for the Ninth Circuit describe the process by which district courts should apply *Booker*, *Gall*, and *Kimbrough* at sentencing. These decisions also discuss in detail the Ninth Circuit's standard of review in sentencing cases.

In the first part of the sentencing proceeding, the Court determines the applicable Guidelines range. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). After this, the parties are given a chance to argue for the sentence they believe is appropriate. *Id.* The district court then considers the § 3553 (a) factors to decide if they support the sentence suggested by the parties. *Id.* Finally, once the sentence is selected, the trial court must explain it sufficiently to permit meaningful appellate review. *Id.* at 992.

In reviewing post-*Booker-Gall-Kimbrough* sentences, the Ninth Circuit first ensures that the district court committed no significant procedural errors at the sentencing hearing, such as: failing to calculate or improperly calculating the Guidelines range; treating the Guidelines as mandatory instead of advisory; treating a sentence within the Guidelines range as presumptively reasonable; giving the Guidelines factor more or less weight than any other; failing to recognize its discretion to vary from the Guidelines based on a categorical policy disagreement with them; failing to consider all § 3553(a) factors; failing to make an individualized, defendant-specific determination based on the facts; selecting a sentence based on clearly erroneous facts; or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.[1] *See United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011); *United States v. Munoz-Camarena*, 631 F.3d 1028, 1030-31 (9th Cir.

---

[1] The Ninth Circuit has pointedly expressed "no view on the question whether we could properly, on appellate review, vacate a sentence because of procedural errors even when the government does not argue procedural error and limits its argument to substantive unreasonableness, nor do we comment on the standard of review to be applied in such a situation." *Ressam*, 679 F.3d at 1085.

2011); *United States v. Blinkinsop*, 606 F.3d 1110, 1114 (9th Cir. 2010); *Carty*, 520 F.3d at 991-993.

A district court is not required to tick through every subsection of § 3553 in a mechanized way, or to "affirmatively state" each § 3553(a) factor, because the Ninth Circuit assumes that sentencing judges understand the law and know their obligation to consider all § 3553(a) factors. *United States v. Treadwell*, 593 F.3d 990, 1013 (9th Cir. 2010). Likewise, "[t]he district court need not 'articulate in a vacuum how each § 3553(a) factor influences its determination of an appropriate sentence,' so long as it responds to 'specific, nonfrivolous argument[s]' raised by the parties and 'tethered to a relevant § 3553(a) factor. *Id.* (quoting *Carty*, 520 F.3d at 992).

If the Ninth Circuit finds no significant procedural error, it must then consider the substantive reasonableness of the sentence imposed under the above-mentioned abuse of discretion standard. *Gall*, 552 U.S. at 46; *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc). In general, a "district court abuses its discretion when it makes an error of law, when it rests its decision on clearly erroneous findings of fact, or when we are left with a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Hinkson*, 611 F.3d 1098, 1114 (9th Cir. 2010) (en banc) (internal quotation marks omitted).

In determining substantive reasonableness, the Ninth Circuit considers the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range. *Carty*, 520 F.3d at 993. But the Ninth Circuit has declined to adopt the presumption that sentences within the Guidelines range are reasonable. Accordingly, the Ninth Circuit affords "significant deference" to a district court's sentencing decision and will not vacate a sentence

just because it thinks a different sentence is appropriate, even if it is certain that it would have imposed a different sentence. *Id.*; *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (stating that *Booker* "[b]reathed life into the authority of district judges to engage in individualized sentencing"). This deference applies to the district court's finding that a § 3553(a) factor justifies the extent of a given variance. *Id.*

For example, the Ninth Circuit has made clear that U.S. District Courts have the authority to order a lengthy sentence of community service or home detention in lieu of incarceration, if appropriate. *Whitehead*, 532 F.3d at 993 (finding no abuse of discretion in the district court's conclusion that 1000 hours of community service, significant restitution, and five years' supervised release were more appropriate than the 41-51 month prison sentence recommended by the Guidelines, in a prosecution involving the sale of over one million dollars' worth of counterfeit access cards for a digital television satellite feed); *United States v. Ruff*, 535 F. 3d 999, 1001-1002 (9th Cir. 2008) (upholding sentencing of twelve months and one day of supervised release in lieu of prison sentence in health care fraud, embezzlement and money laundering prosecution, while noting that "extraordinary circumstances are not needed to justify a sentence outside the guidelines range, and we must give due deference to the district court's decision that the sentencing factors warrant a particular variance.").

As the Ninth Circuit recently noted in a major en banc decision, the substantive reasonableness standard "has much in common with other deferential standards applied in other contexts, such as the 'manifest-injustice' and 'shocks-the-conscience' standards." *Ressam*, 679 F.3d at 1087. Such standards are: (1) deferential to district courts and provide relief only in rare cases; (2) highly contextual and not permitting of easy repetition in successive cases; and (3) dependent on the informed intuition of the appellate court applying

the standards. "In sum, these standards provide a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *Id.* (quoting *United States v. Rigas*, 583 F.3d 108, 123 (2nd Cir. 2009).

What does this mean in practice? The substantial doctrinal deference afforded to district court sentencing decisions has resulted in the Ninth Circuit reversing only one district court downward variance for substantive unreasonableness in the over eight years of the post-*Gall/Kimbrough* era. *See* Exhibit C, Sentencing Resource Counsel Federal Public and Community Defenders: *Appellate Decisions After Gall* (also available at http://www.fd.org/docs/select-topics---sentencing/app_ct_decisions_list.pdf.[2]).    That    single decision is simply inapposite to the case before the Court; the Ninth Circuit's decision in *Ressam* vacated a thirty-three year downward variance, on the basis of the defendant's life history and personal characteristics, for a terrorist and career criminal who planned to blow up Los Angeles International Airport. *Ressam*, 679 F.3d at 1069. The Ninth Circuit has not found a below-Guidelines sentence in the white collar crime context to be substantively unreasonable since *Gall*, and in fact, the Ninth Circuit has found a within-Guidelines sentence to be unduly harsh. *See United States v. Edwards*, 595 F.3d 1004, 1019 (9th Cir. 2010) (Bea, J., concurring) (discussing Ninth Circuit split on below-Guidelines sentences); *United States v. Amezcua-Vasquez,* 567 F.3d 1050 (9th Cir. 2009) (reversing within-Guidelines sentence as substantively unreasonable).

Thus, the threshold for reversal on substantive grounds is rarely reached, especially where the district court provides a consistent record of the facts and reasoning supporting its

---

[2] Figures are as of December 5, 2013. Our research has not found any other published Ninth Circuit decisions reversing a downward variance as substantively unreasonable as of the date of this Sentencing Memorandum.

decision. A district court exercising its discretion in varying from the sentence recommended by the Guidelines can be assured that its decision will not be found to be an abuse of discretion where that decision has some rational basis in the record and facts regarding the defendant and his alleged crimes and is not grounded in prejudice, disregard for law, or other erratic considerations.

## III.   THE HISTORY, BACKGROUND, AND CHARACTERISTICS OF MIKE ROSE (§ 3553(a)(1)).

### A.   Mike Rose's Character and Good Works.

If there is one theme that runs through the many letters submitted to the Court, it is that Mike behavior in this case is completely out of character with the type of person he has been throughout his life. This theme is repeated in nearly every letter, by people who have known Mike intimately for years. These letters are attached to and incorporated by reference into this Sentencing Memorandum as Exhibit A, and Mike's letter to the Court is attached as Exhibit B.

A person's true character cannot be faked, at least not for long, or ginned up for purposes of a sentencing memo. It is developed and exhibited over a lifetime. The letters submitted on Mike's behalf paint a picture of a man who genuinely cares for the well-being of his employees, community, friends, and family. Although Mike made his own success through hard work and perseverance, his friends discuss how he always jumps at the opportunity to reach a helping hand to those going through struggles, without fanfare or any effort to take credit. Loyal to a fault, Mike gives everyone a second chance and goes out of his way to provide for the less fortunate.

One remarkable theme immediately present in all of the letters submitted by Mike's former employees is the genuine concern he had for their well-being—not just as employees, but also as individuals. Despite operating in an industry which is often given a reputation for

attracting the morally unscrupulous, Mike is the antithesis of an exploitative businessman. To the contrary, Mike's former employees universally describe how Mike's support has allowed them to survive and flourish.

Before Wayne Evans "ever actually met Mike, I heard numerous stories about his selflessness and devotion to his employees." According to Wayne, Mike was known within the Myrtle Beach business community as an up-and-coming go-getter and "an ethical businessman who did not cut corners, was very loyal to his 'family' of employees and was a father and husband." Mike frequently took financial losses to ensure the stability of his employees; whereas many clubs cut hours or close for certain days in accordance with seasonal trends, Mike operated his clubs at summer hours during the winter. Even though he personally took a loss doing so, Mike understood that his employees were as equally reliant on their paycheck during the winter as during the summer, and he did not want to put them in a financial strain during the holidays. Wayne says that, on multiple occasions, he witnessed Mike use his own cash to make payroll. "His loyalty and devotion to his family of employees is well known in our community. As a result, one could find people who worked for him 10+ years. In an industry with notoriously high turnover rates, this is virtually unheard of."

Tracye Osborne first met Mike when he purchased the restaurant where she worked in 2012. Mike warmly greeted the existing staff, told them they would remain employed, and included them in the reopening. Tracye says that she and Mike did not hit it off from the beginning, "but he kept his promise and held my position open for me, even during pregnancy and afterwards while I took a leave to take care of my little girl."

Shortly after returning to work, Tracye "encountered a life changing situation that would leave me a single mom. Mike called me into his office one evening and reached out his hand

for support. Not only was he there to help me financially and emotionally overcome my immediate struggle but he went out on his own and bought my daughter tons of clothes and things she needed. He has been a solid foundation for me to lean on ever since." Mike gave Tracye, who was on the verge of homelessness, sufficient money to support herself for six months. Tracye used the opportunity to enroll in college, and she is now a nurse in Myrtle Beach. "Mike never told anyone what he did for me and I only bring it to the court's attention to show the heart this man has."

Mark Campbell was hired by Mike in 2002 to work as a DJ in a nightclub Mike owned. At the time, Mark felt that Mike was too demanding, but Mark has since "come to consider his tutelage to be the single greatest positive factor in my formation as an artist and businessman." Mike "never let him settle for second best." After a few years, Mike noticed Mark's technical production skills and recommended that he be promoted to the parent nightclub chain above Mike's club. Mark recognized that such a promotion would allow him to switch from night shifts merely performing operations into a day job where he could develop his engineering and production skills. "In short, he was setting me up to learn how to create the very business that we both enjoyed, and giving me a paycheck for doing it." This change in a career also allowed Mark to "enjoy having and raising a family." Mark's kids love Mike and call him "Uncle Mike."

Mark describes Mike as "one of the most generous bosses a man could hope for." Mike "gave me the van I drive for my business today. He gave me the lawnmower that I cut my grass with at home." Mike hands out bonuses to his employees at Christmas which, according to Mark, is "unheard of" in the nightclub industry. Moreover, when Mark, "was at a difficult time in my life, Mike sat down with me on his back porch and just listened to me talk for hours

one Saturday morning, never passing judgment on me, just letting me know he understood how I felt, and cared that I saw my way through it."

Mark reports that "[h]undreds of workers are directly affected by the closure of [Mike's] nightclubs. Tax revenues in the hundreds of thousands and employee salaries in the millions simply don't exist because Michael Rose no longer has a management company."

Brea Stines, currently an EMT and on the verge of becoming a Paramedic with a degree in Applied Science, was employed by Mike for ten years as a bartender and manager. Brea struggled to balance the demands of school with working enough hours to pay her bills. Mike not only offered her a flexible schedule but also provided her financial support to pay her bills. "Unlike other bosses, he has always supported employees furthering their education or bettering themselves, even if it meant they would move on to other things." Brea says that Mike "pushed me and many other employees to be our best and strive for more out of life. Even though he expected greatness from us at work, he is the most charismatic and understanding boss I have ever had. Anytime anyone he knew needed anything, Mike was the first to step up."

Whitney Cast has known Mike for ten years, nine of those as an employee. Ms. Cast started out as a front door hostess and, through employment with Mike, "was able to put myself through undergraduate and graduate school. When I needed a raise due to increased school costs he gladly gave it to me no questions asked. He understands the importance of school and even let me complete homework assignments or study while I worked at the front door of his establishment." On Christmas, Mike "would visit each of his businesses and give generous tips or buy food for people working on the holiday." Over the years Ms. Cast has

seen that Mike "believes in giving people second chances, and he doesn't give up on them easily."

Ronald Bennion has known Mike since 1998. "On countless occasions [Mike] would motivate others, spending the time to teach anyone that is willing to put in the effort to excel at their jobs." Even after Ronald "had to relocate because of losing my job, [Mike] offered to hire me even though he didn't have a position for me." Ronald describes Mike as a leader and someone who is willing to work his hardest to make everyone around him better. "He always told us that one of the most important qualities of a leader is to possess the ability to give people a chance to fix the mistakes they have made. Countless times he has given employees a chance to learn from their mistakes."

When Michael Franzi was between jobs, Mike offered him a manager position, and Franzi "enjoyed every second of working and learning from him." In the eight years that Franzi has known Mike, "he has always put the needs and cares of others before his own."

Jill Finnell similarly describes how Mike offered her a job when she was unemployed and struggling to make ends meet. "He's helped me move, lent me his car for days on end during an emergency, picked me up when I was stranded, and I could go on and on. He may not even remember any of those things because helping people any way he can is just who Mike is." Mike also offered his house rent-free, without being asked, to Jill's parents when they were visiting her and had no place to stay. "It was because of him I was able to have almost a week with my family, something he knows is very important to me, especially with my own father's declining health." Jill has known Mike for 10 years. "Never, in all the years I've known him and worked for him, have I ever seen or known him to do anything without the utmost integrity." Jill sees Mike as "remorseful beyond words."

Michael Pombrio describes Mike's friendship with Pombrio's younger sister, Erica. Because Mike worked in the Gentlemen's Club industry, Pombrio at first pre-judged Mike's character. Then Erica was diagnosed with an aggressive form of cancer at age 22 and moved home to New Hampshire for treatment. "Through her illness, Mike was one of the very few constants in her life." As busy as Mike was, "there were very few days he did not find time for my sister, even after she had moved from Myrtle Beach back home to New Hampshire." Mike talked to Erica "almost every day on the phone even when, outside of family, Erica had lost contact with most others in her life." As Erica's medical bills mounted, "[a]t no one's behest, he organized a fundraiser for her at one of his establishments." Erica died a year after her diagnosis, and Pombrio almost immediately called Mike to let him know. "I could hear the heart-break in his voice just as I had felt my own." Mike traveled to New Hampshire for her funeral later that week, and every time he is in New Hampshire, he stops to pay his respects to her. "I know Mike to be a man with the kind of heart possessed by very few others who I have encountered."

Pombrio knew Mike's reputation as one who would do anything for his employees, and he approached Mike about employment. Soon after starting to work for Mike in Myrtle Beach, however, Pombrio requested another favor: that Mike hire him in Mike's business in New Hampshire. Mike agreed without hesitation and even paid for Pombrio's flight home. "I will forever be grateful to Mike for both his connection with Erica in her last days and for the opportunity he gave to my family and I. If not for that opportunity, I really shudder to think about the dark place my sister's death could have left me in."

Mike's former business partner, Rocco DiBernardo, repeats the same sentiments as Mike's other employees. Rocco had never taken on a business partner, but he was so impressed

with Mike's business savvy that, within two weeks of meeting him in 1994, they opened a small tanning business together. Mike ran the business sometimes seven days a week and twelve to fourteen hours per day. When Mike had an opportunity to move to Los Angeles, Mike promised Rocco that he would repay his share of the partnership's outstanding loans. Mike made 60 monthly payments, without fail, for a total of $15,000. "All I can say is that Michael's integrity is upmost in its nature. I have never had a better relationship and friendship over the years and he is a truly a brother and we treat each other as family."

In total, Mike has employed over two hundred people in the Myrtle Beach area alone, and he has been a "significant asset" to all of them and the Myrtle Beach community. Mark Campbell notes that Mike's presence in Myrtle Beach is already "sorely missed."

Although Mike is dedicated to improving his businesses, he will drop his work "with no hesitation" when a friend is in need. Chris Yarborough describes a recent accident that left him fighting for his life in intensive care. Despite being extremely busy with business operations, Mike immediately rushed to North Carolina to be with Chris. "He provided invaluable counsel to me and this had a major impact on my life's outlook and my recovery. He kept me positive and even offered to allow me to stay with him at his home with his wife and children during my recovery."

Similar tales are echoed by others: when Vicki Calviera's father was ill, Mike regularly checked in to offer his prayers and see if she needed any help, and when her father passed, Mike was one of the first to offer his condolences. "Mike has a big heart which has been a blessing to everyone that knows him." Mike reached out to Eva Joline within minutes of finding out that her husband had died, inviting her to his family's Christmas dinner. When Wayne Evans was in the midst of personal and financial losses, Mike consistently checked on

him out of genuine concern for his well-being, when most people had turned their backs. "His encouragement and friendship at a time when I needed it most had a longstanding impact on my life, for which I will always be grateful."

Carl Reid describes how Mike took the time every few weeks "like clockwork" to visit Carl's father, Mike's former business partner and mentor Jerry Reid, as Jerry's health deteriorated from progressive supranuclear palsy. While all of Jerry's other friends had stopped visiting over the years of his degenerative illness, Carl says that nearly every time he went to visit, Mike had been there just the day before. "Most importantly right up to the last week of my dad's life Mike went and spent time with my dad and brightened his life, which means the world to me and my family."

Mike's charity is not limited to his friends and employees. The letters submitted on Mike's behalf nearly universally attest to his sponsorship and organization for sizeable charitable events in his community.

For multiple years, Mike has held a fundraiser and collection for the local Boys and Girls Club called Christmas in the Square. He spends hundreds of hours each year posting flyers, raising money, and collecting food and gifts for less fortunate children in the community, ensuring they have the same joy at Christmas that he wants to provide for his own family. Mike and Stephanie Rose sort and wrap every gift, marking it with an appropriate age and gender. Christmas in the Square culminates in Mike hosting a lunch and meet and greet with Santa. He arranges transportation by bus for every child and his or her chaperone, sets up arts and crafts for the children to design, and organizes a buffet lunch. He also coordinates decorating and the other behind-the-scenes work necessary to make the event a success. Each child gets to sit on Santa's lap and goes home with two gifts. Mike's event routinely provides

over two hundred children with meals and gifts, and every dollar raised is donated back to the Boys and Girls Club. "The joy on the kids' faces for all that was done for them that day was absolutely amazing," Tracye notes.

For thirteen years, Mike has performed similar feats for the U.S. Marine Corps Reserve Toys for Tots Program, another fundraiser and collection drive to help less fortunate children experience the joy of the holidays. Each year, Mike orchestrated gift collections at numerous locations throughout Myrtle Beach for a month leading up to Christmas. Mike also organized and sponsored an annual Christmas Drive in Atlantic Beach, a relatively poor community. Ronald Bennion watched one year as Mike was not satisfied by the low turnout. Mike knew there were more kids in the community who needed help and suspected that they did not know about or could not get to the event. He grabbed a company van and drove throughout the community, stopping at homes and offering rides to the party. "Some of those children would not have received anything for Christmas if it was not for his generosity."

One of the causes in which Mike is most deeply involved is autism awareness, borne out of his experiences with a friend's autistic son. Even in February 2016, the month Mike pled guilty, he helped coordinate a month-long autism fundraiser. Over the years, Mike has also repeatedly donated the use of his restaurants and his own personal time for fundraisers for autism research and therapy. Each year he collects money for Duke Children's Miracle Network by selling raffle tickets, one year helping to raise over $34,000 at the nightclub he oversaw and, amazingly, over $100,000 company-wide.

Each year during Bike Week, an annual event where thousands of bikers descend on Myrtle Beach, local law enforcement toils to ensure the city has a safe and enjoyable event. In 2014, however, the city had eight shootings and three deaths during Bike Week alone. After

the conclusion of the week, Mike hosted a full meal and fundraising raffle at Rodeo Bar and Grill, paid out of his own pocket, to thank law enforcement and first responders for their hard work and dedication to protecting their community during the stress-filled week. The Myrtle Beach police department, fire department, and first responders appreciate Mike so much that they show up at Christmas in the Square each year with toys to donate.

Mike is also involved in countless smaller causes in the community, providing aid to friends and citizens in need. He donates to Mark Campbell's daughter's school and cheerleading fundraisers and a fundraiser Mark's wife puts on for the elderly. Two days before a prom for students with special needs, Mike jumped in to sponsor the nail booth when no one else had. Mike also provides support for the Goat Run, a race benefiting Relay for Life, and the Diane Moore Breast Cancer Fund. When a friend participated in a country-wide run to raise awareness for the Wounded Warriors project, Mike not only personally donated money but also organized a social media campaign to fundraise further. According to Michael Franzi, "he has always looked out for the good and happiness of others before his own."

Mike does not do these charitable events for any recognition. Although the size of Christmas in the Square attracted local media attention, Mike "was humble throughout the entire ordeal. He truly wanted no reward or praise," Ronald says, "aside from the smiles on those children's faces." Mike's only concern is that his mother is able to attend his charitable fundraisers each year, and he encourages his other family members and friends to attend as well. Tracye says that Mike taught his employees to help those in need, and many of them volunteer to help with the planning of Christmas in the Square. Eva Joline says that Mike performs these acts "quietly without seeking praise or recognition from others."

Many of the letters submitted on Mike's behalf reinforce the deep commitment he has demonstrated for his children and their reliance on him, financially and emotionally. As Jill Finnell states, "if you judge a man's success in life by numbers, then you could say he's done very well after putting in years and years of hard work. But my friend's attributes that make him someone I respect and admire more than most are found in the loving husband I've seen him become, the adoring father he is to all his children, and the giving family man."

Mike has five children: Matthew, age 26; N.R., age 13; C.C., age 6; Pr.R., age 1, and Pi.R., four months old. Mike became a father to Matthew at the age of eighteen. Rather than shirking his responsibilities as a young father, he embraced them. Mike divorced Matt's mother while Matt was still young, and as he grew, Matt "started to cause problems." As a result, when Matt was about eight, he moved in with Mike full time in order to ensure Matt would grow up in a more stable environment. Mike attempted to instill the same virtues in his son as he valued himself. When Matt was about 12, Mike took him to Toys-R-Us to buy a stockpile of toys, but none for Matt—all to donate to the local children's home. Matt says that Mike stressed the importance of focusing on his education and never giving up in the face of adversity; Stephanie Rose "saw the pride in Michael's eyes when Matthew walked across the stage at his high school graduation."

Mike asked Mary Helen Rebolini if she would be willing to hire Matt for his first bartending job, and Mary says Matt was her favorite and most trustworthy employee. "Mike did an outstanding job raising his son and instilled the same characteristics that he himself has." Mike subsequently hired Matt to work in his businesses, and Matt's work ethic is described by coworkers as impeccable. "It is obvious Matt has watched his father work hard to

get where he is. Matt has so much admiration and respect for his dad, it was amazing to watch him work hard so he could one day get to be where his father is now."

Matt says he would grow frustrated with Mike as a businessman, questioning why Mike always gave second chances to employees who had taken advantage of his generosity by stealing or not showing up to work. "It was these times that I realized that my father was a true believer in redemption and second chances. Lo and behold, the majority of these employees turned out to be the best employees he still has today."

Eleven years later, Mike re-married and had a second child, N.R. Mike and N.R.'s mother divorced several years later, and although Mike does not have full custody of N.R., the love and support Mike provides to him is no less than for his other children. N.R. lives with Mike every other weekend and every day during the summer and holidays. On these days, Mike loves to spend all day together with N.R.: going to lunch, watching movies, or throwing a football around. Mike has attended every single one of N.R.'s soccer games and academic honor roll ceremonies. His care for N.R., however, is just as strong when they are not together. Out of his concern for his ex-wife's stability and to ensure N.R. has the same opportunities as his other children, Mike has paid his ex-wife's mortgage since 2002 in addition to child support since 2006. N.R.'s mother describes Mike as a "great father who would always help out if I needed him." If Mike is sentenced to a prison term, it will be a strain on her to support herself and N.R. without Mike's support payments. She also worries about how N.R. will react to Mike's absence. Because N.R.'s mother's entire family is overseas or deceased, N.R. is extremely close to Mike. Stephanie Rose says, "now that N.R. is a little older, he understands that Mike made many sacrifices for him, went above and beyond to make sure that N.R. had all the things he needed, and was very far from an absentee or weekend-only father. I worry very

much about taking Michael out of N.R.'s life in any capacity." Due to the extensive media coverage of Mike's arrest, N.R. is teased at school. "Being the kind of Dad he is, this has hurt him more than any kind of punishment the court could impose," Linda says.

In 2015, Mike married Stephanie Rose. April Titus, Stephanie's mother, describes how her heart broke when she learned her daughter was moving to South Carolina to marry Mike, whom she had not met. Due to this rift, April and Stephanie cut off communication. April lost contact with Stephanie's child, C.C., who was "the light of her life." Even though Stephanie was still upset with her mother, Mike reached out to April to make amends and reunite the family. "He sympathized with our loss and truly understood how Stephanie's decisions had affected our family."

Now, April describes Mike as the type of son-in-law that every mother wants for her daughter: a loving husband and a hardworking, dedicated father. Every day, she says, Mike spends time with each of his children individually, allowing them time to play, read, hug, or share a story directly with their father. "He has rare qualities that I pray he passes to my grandchildren; he is a loving, loyal, honest human being."

Since marrying Stephanie and welcoming C.C. into his home about a year ago, Mike has become C.C.'s father in the truest sense of the word. When he was younger, C.C. was a very emotional child; his biological father left him and never attempts to contact or support C.C. Stephanie describes the time and energy Mike has spent helping C.C. become more emotionally secure. "While it may seem insignificant, I know this gesture aided in C.C. feeling as though Michael is someone he can trust to take care of him, who will show him he doesn't need to be afraid, to wipe his tears and that he encourages him to get back up if he falls. C.C. truly loves Michael."

C.C. has severe asthma, and Mike and Stephanie have to perform breathing treatments on him every four hours during the day and sometimes during the night. Mike provides complete financial support for C.C. so Stephanie can focus on C.C.'s medical needs. "Of all of the children, C.C. will be the most negatively impacted if Michael is not physically with us at home. He will be absolutely devastated. . . . Not having him in our home to help guide him, be the mentor he is to him, and continue to provide him all the love, support, and caring he's always shown would be catastrophic in C.C.'s life. I would never be able to fill that void."

Twenty-five years after his first child, Mike finally fulfilled his wish for a daughter last year. Pr.R. is "the biggest daddy's girl" with quite possibly "the strongest bond with Michael." Like C.C., Pr.R. also has severe asthma which requires frequent inhaler use and breathing treatment approximately every four hours. "Although she is young, she would most undoubtedly miss the strong relationship and bond she has with her father if he was not physically present in our home to help raise her through the most important years of her life. I can only imagine her walking into our home very confused, continuing to look for him, and to listen for his footsteps to come walking through the door to pick her up and kiss her." Pi.R. is Mike's newborn daughter, and Stephanie is devastated to think that she "might not have the same opportunity to grow a bond with this amazing man, her father, which our other children have had."

In addition to caring for his children, Mike is also the patriarch of the Rose family. Mike provides complete emotional and financial support to his ailing parents. Mike's mother, divorced for over a decade, had to continue working through her elderly years to make ends meet. Mike provided her with a home and bought her a car so she would be able to retire. Now, Mike's mother suffers from COPD and other ailments, and Mike pays every expense, runs her

errands, does her daily chores, and does anything else she needs. He also provides emotional support by frequently being around and paying for her to travel and visit her children and grandchildren. "If Michael were to no longer be with us for a period of time physically, there is a strong chance that the last time he sees his mother would be before he leaves for sentencing."

Kelly Rose, Mike's sister, was on the verge of homelessness with nowhere take her four children. Mike was the only family member who stepped up, giving her $1,000 to help buy a home. "He saved my life, my kid's life. Gave me a chance to be the Mom my kids are proud of." On another occasion, he surprised Kelly's daughter for a back to school shopping spree when Kelly could not afford it, driving from Myrtle Beach to Florida just to take her shopping. He told his mother that he did this just so his niece would feel good about herself when she started school.

Stephanie Rose told the probation officer that she wishes the Court could have met Mike before he became involved in his crimes to see just how out of character his conduct was. Stephanie opines that Mike became involved because his partner had recently embezzled money from their business, leaving Mike without two years of pay and desperate to find a way to support his family and mother. She believes that, if not for Mike's vulnerability and financial stress at the time he was approached, he would never have become involved. The probation officer quotes Stephanie: "No matter how much custody time he receives, the impact on the entire family will be devastating because a lot of people depend on him emotionally and financially."

The above accounts of Mike's character and good works do not constitute a complete listing. Space limitations prohibit such an accounting. As we have noted, Mike's exceptional character, and his lifetime of good works, are factors that the Court not only can, but must,

consider in imposing sentence, according to § 3553(a)(1) and § 3661. Good works and good character are valid bases for a *Booker-Gall-Kimbrough* downward variance and need not be exceptional. *See United States v. Warner*, 792 F.3d 847, 857 (7th Cir. 2015) ("A defendant's record of charity may justify a lenient sentence. . . . [T]o survive appellate review, a defendant's good works must be sufficient to justify the variant sentence, but they need not necessarily be exceptional."); *see also United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013); *United States v. Tomko*, 562 F.3d 558, 560 (3rd Cir. 2009); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008).

The simple truth is that Mike is a good person who has done many good things over the course of his life. He strayed from that character when he committed these crimes. He knows this is "the biggest mistake he ever made in his life." It is obvious based on his history to date that Mike will continue to provide outstanding service to the community and society if the Court grants him a sentence of time served.

### B.    Mike's Family Circumstances and Dependents

Another § 3553(a)(1) factor strongly arguing in favor of a sentence of time served is Mike's family circumstances, including the dependents whose lives would be prejudiced in his absence. In the post-*Gall/Kimbrough* era this is unquestionably a valid ground for a downward variance. *See*, *e.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008) (affirming downward variance to probation based on finding that defendant was a "devoted husband, father, and son"); *Sayad*, 589 F.3d at 1117-18 (varying downward based partly on the "necessity for [defendant] to be with his family considering his father's health and their ability to survive, if not prosper, in the [their] business"); *see also United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

In reviewing the letters submitted on Mike's behalf, the Court cannot fail to appreciate the profound blow to Mike's loved ones should he be sentenced to a prison term. As the many letters to the Court attest, Mike's level of involvement with his sons is extraordinary. Mike's historical involvement with Matthew is remarkable, providing support since birth and raising him unassisted by Matt's mother since Matt was 9 years old. Although Matt no longer works for Mike's business, he remains financially dependent on Mike as he works to establish his career. Mike has also demonstrated deep involvement with his son, N.R., and step-son, C.C., and Stephanie Rose is certain both will be emotionally damaged if Mike is not at home. Moreover, Mike has shown a lengthy history of strong financial support, providing nearly $4,000 per month to support N.R.'s mother solely to ensure the stability of N.R.'s home. Mike pays for all of the costs of raising his four younger children, including significant medical expenses for breathing treatment for C.C., Pr.R., and, possibly in the future, Pi.R. Stephanie Rose is dependent on Mike for his support in operating a business that he once owned where she works. Linda Rose, Mike's mother, is also completely financially dependent on him, as he pays for her housing, vehicle, and insurance, and he performs all of her daily housework. Linda Rose knows Mike fears having to say goodbye to her—and that she may never see her son again. "I don't want to see an entire family destroyed over one mistake."

Although the crimes Mike committed are said to be victimless, there will be seven victims: his wife, his five children, and his mother. The letters are uniform in stressing Mike's indispensability in the lives of his children, whose developmentally critical years would pass without the crucial guidance of their father. Probation Officer Spitalieri recognized the significance of Mike's family's reliance on him for support, finding it noteworthy enough to recommend a downward variance on this basis. (*See* Sentencing Recommendation at p. 2.)

While criminal defendants frequently have family ties and dependents, one cannot read the letters submitted to the Court without gaining a sense of how exquisitely the Rose family would feel Mike's absence. As Matthew Rose describes,

> The severity of the case weighs very heavily on my father and our family. My father supports so many people, in many different households, through his daily interactions and monetarily. We will all be devastated if he is not able to serve a sentence that keeps him as an active parent. The world will be hurt by losing an individual who is a positive member of society. My father is truly remorseful, and will forever be. The life lesson he is receiving is one I wish I never had to watch. He is such an amazing father, and such a positive and impactful person to everyone. I know that he will take these lessons and do something positive with it. He will never let a mistake define who he is, but grow from it.

It is no hyperbole to say that a sentence of imprisonment for Mike could well leave the Rose family permanently scarred.

## C.   The Aberrant Nature of Mike's First Offense.

Mike is a first-time offender. As the evidence of Mike's prior character demonstrates, the crimes he committed are aberrant in nature. We fully understand that, because the enterprise was executed over a period of years, it cannot be considered aberrant within the Guidelines meaning of that term. But there is no question that measured against Mike's entire life, or even his professional life, the crime was atypical in nature. The Court is free to consider this fact in support of a *Booker* downward variance. Probation Officer Spitalieri also referenced Mike's law-abiding life in recommending a downward variance under 18 U.S.C. § 3553(a)(1).

As noted above, *Pepper* reiterates that district courts be permitted to consider "the widest possible breadth of information about a defendant." *Pepper*, 131 S Ct at 1240. First offender status can be considered as a ground for downward variance, and the U.S. Probation

Office has recommended as much in this case. But the atypical or aberrant nature of Mike's conduct merits independent consideration. Mike is not one of those first offenders who has spends his professional life defrauding people and finally gets caught. The money laundering scheme that he executed was joined out of reluctant desperation and is not representative of the broader man. The Court should grant a variance based on the atypical nature of Mike's crimes when viewed in the context of his life as a whole. *See, e.g.*, *United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (affirming downward variance for personal history of defendant where district court found that defendant made an "isolated mistake," even though the crime was a two-year-long fraud enterprise); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (affirming downward variance where district court considered need for the sentence imposed and stated that the defendant was simply "a law abiding citizen, who [did] an incredibly dumb thing").

### D.    Mike's Family and Community Support

As the Court can glean from the many letters and testimonials submitted on his behalf, there has been an outpouring of family and community support for Mike. For over a decade, Mike has habitually contributed significant time and resources into serving the less fortunate in his community, and that community has expressed their gratitude and desire to help Mike in return. As Mike's brother Dr. Jonathan Rose powerfully stated:

> I have yet to state my big brother's name. This is purposeful. For the rest of his life and regardless of his sentencing, he will be known as Michael Rose, a convicted felon. As a consequence, he will forever be punished for that which he has pled guilty of doing. To others, he will be a criminal. To me, he's my big brother. I've spent many years in education and training. I have learned many things and from many brilliant teachers. No one has taught me as much as my big brother. He has shown courage in the face of adversity. He has owned up to his actions and has taken responsibility. He is accountable. He is prepared for the

consequences. He is not alone. My family stands by him. We will support him, by any means necessary, be they economic, social, familial or otherwise. My big brother showed me I could be tough, that I could be confident, that I could be trusted and that I never had to worry about myself or any member of my family. He never let me fall. I let him down and wasn't around to prevent him from doing so. I will not allow it to happen again.

The letters submitted on Mike's behalf show a group of friends and family members struggling to understand Mike's crimes yet waiting expectantly for an opportunity to welcome back into the community someone who has helped them so much. The financial and emotional support on the outside that a defendant can be expected to receive from family and community members is another valid basis for a downward variance. *See*, *e.g.*, *Sayad*, 589 F.3d at 1114-1115; *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

### E.    Mike's Genuine Remorse and Truthful Debriefing.

As the Court can tell from Mike's letter to the Court accepting responsibility for his conduct, and as the Court will see firsthand at the Sentencing Hearing, Mike is sincerely remorseful, deeply ashamed, and extremely guilt-ridden about his conduct. This is also a theme that repeatedly and spontaneously appears in the many letters from Mike's intimate circle of family and friends—the people who know him best. The manner in which Mike and Stephanie explain the consequences Mike's unlawful behavior will have on their children further attests to the sincerity of his remorse.

True remorse goes beyond acceptance of responsibility. A person can accept full responsibility for his conduct without being sorry, ashamed, or guilt-ridden for what he did. A

person can accept full responsibility without feeling empathy for his victims. That is not Mike Rose. Mike's true remorse is a factor that the Court can consider in deciding whether to grant a downward variance and how much of one to grant. *Ruff*, 535 F.3d at 1001 (upholding district court's downward variance based on defendants' "clear remorse").

Mike's remorse was also a factor in his truthful debriefing with the Government, which is reflected in his eligibility for safety valve relief pursuant to 18 U.S.C. § 3553(f). Mike's proactive cooperation is partly reflected in the three points Mike is scheduled to receive for accepting responsibility, but the Court can also consider Mike's ready, willing, and eager debriefing in deciding to grant a further downward variance. A defendant's cooperation with the Government's investigation, *United States v. Stewart,* 590 F.3d 93, 140 (2nd Cir. 2009) ("[O]f course, use of a defendant's cooperation to justify significant variances or departures from the otherwise applicable Guidelines calculations is commonplace."), and a defendant's true remorse, whether exceptional or not, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008), are both valid and independent bases for downward variances.

## F.    Mike's Suffering

It is obvious that Mike has suffered from the criminal investigation and prosecution of his activities. As a prominent businessman whose case has been subject to extensive local media attention, Mike can only watch as his son N.R. is bullied at school over the stories on the news about Mike's case. It is impossible to overstate the emotional and reputational suffering of someone like Mike, whose entire life has been tied up with providing for and setting a good example for his family.

Mike stands humiliated in front of his friends and former employees. By pleading guilty, he is branded for life as a felon. Mike has lost all of his clubs and businesses, and will have to

climb a steep hill to enjoy the financial success he once did. He has unquestionably suffered for his acts. This Court is entitled to take Mike's suffering into account in determining what sentence to impose.

### G.      Mike Rose's Strong History of Employment.

As the PSR and Mike's own letter make clear, Mike has been working hard for all of his adult life, up until just before he entered his guilty plea. Mike has demonstrated an incredible work ethic, having worked sixteen hours a day and seven days a week to provide for his family. Mike's history of gainful employment is exceptionally lengthy, and his employees and friends attest to the impact his entrepreneurship and generosity have had on their lives and their surrounding community. Moreover, Mike has a history of generating a substantial number of opportunities for his community, having employed several hundred employees in Myrtle Beach and contributing significant resources to community service. This is a factor that the Court may consider in imposing a sentence and in granting a downward variance. *Ruff*, 535 F.3d at 1001 (9th Cir. 2008); *see also Tomko*, 562 F.3d at 570-72. There is no question that if the Court grants him a sentence of time served, Mike will immediately find beneficial work to make restitution, provide needed support to his children and create jobs for his community.

### H.      Summary.

The U.S. Probation Office has recommended a downward variance in Mike's case from an advisory Guideline range of 87 to 108 months to 60 months, for which we are grateful. The probation officer considered four bases for downward variances: Mike's personal history and characteristics under 18 U.S.C. § 3553(a)(1); the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; the need to promote respect for the law under 18 U.S.C. § 3553(a)(2)(A); and the

need to protect the public from further crimes of the defendant under 18 U.S.C. § 3553(a)(2)(C). (Sentencing Recommendation p. 2.) We respectfully submit that, the Court should vary below the advisory Guideline range for each of these reasons. In addition to the items articulated by Probation Officer Spitalieri, the background factors discussed above, including: (1) Mike's prior history of good works and good character; (2) the harm to Mike's children that would flow from his incarceration; (3) the aberrant nature of the offenses; (4) Mike's deep remorse and suffering; (5) Mike's truthful and proactive debriefing with the federal government; and (6) Mike's employment history and promises of support, all militate in favor of an additional downward variance.

## IV.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE CALL FOR A SENTENCE OF TIME SERVED (§ 3553(a)(1))

The Court is familiar with the nature and circumstances of the money laundering and narcotics enterprises and Mike's role in them. Mike's personal financial stress at the time that he entered the enterprise and the extraordinary nature of the Government's involvement in these crimes, as it pertains to Mike's individual case, are significant mitigating factors.

Mike's motivation for entering into the criminal enterprise was one of desperation, not greed. *See Wisconsin v. Mitchell*, 508 U.S. 476, 485, 113 S. Ct. 2194, 2199, 124 L. Ed. 2d 436 (1993) ("The defendant's motive for committing the offense is one important factor."). This consideration weighs against Mike's culpability and his need for punishment. He was not a seasoned criminal who weighed the potential profits of the criminal activity against the concomitant risks. Instead, he was a law-abiding citizen who was on the brink of financial ruin, and he took the undercover's bait at an opportunity that seemed like the only way out.

From his teenage years, Mike Rose worked tirelessly to develop his entrepreneurial skills. He frequently turned his ideas into reality, creating a series of local businesses, mostly

strip clubs, in various cities across the country. Throughout these successes and failures, he strived to develop his name in the community as an honest businessman while making enough income to support his young family. Finally, after nearly a decade of constant labor, Mike finally struck gold. His talent and booking agency catapulted to national success. Mike learned the business and the need for agents who protect and look out for the well-being of their dancers. Mike traveled across the country, touring hundreds of nightclubs and watching what made certain nightclubs successful. He ultimately turned his knowledge into a relationship with a prominent nightclub owner in Myrtle Beach, South Carolina, and Mike partnered with him. Eventually, Mike's young ambition and endless work ethic allowed him to set off on his own, and he developed his own nightclub chain into the fastest growing in the industry.

In early 2012, Mike realized his businesses were in serious trouble financially—and he was too. Mike's new business partner had stopped paying Mike his management fees and shares of the profits, so Mike checked into the clubs' financial records. During this investigation, he uncovered a massive theft and tax evasion scheme by his business partner. Mike's businesses had over $300,000 in tax debt caused by the partner's behavior, and he was out of cash. Mike had recently opened a new country music venue which was one of the largest in the country, and his two partners had failed to fulfill their obligations under the operating agreement. Mike had to protect his businesses from failing or he would lose everything for which he had ever worked. Mike stressed, wondering how he would pay for his clubs' arrearages and operating expenses while still being able to provide a stable job for his employees. Without earning some income soon, he would be unable to provide for his three children, including the support to N.R.'s mother to ensure his stability and C.C.'s medical expenses, or his mother's medical and personal expenses.

Then a friend, Vladimir Handl, approached him about making quick money, with an opportunity to develop a relationship with potential investors who could infuse cash into his struggling clubs. Mike agreed to attend an exploratory meeting on February 10, 2012, with Handl and his contact—an undercover agent who, at the time, was expanding an investigation into Richard Leyland that had begun three years earlier. Even during the meeting, Mike knew the undercover's business was illegal, and he did not commit to the enterprise. Instead, he attempted to steer the undercover agent into an investment to prop up his flailing nightclub chain:

Rose:       I wouldn't want to do it through my existing clubs.
Handl:      Build a new club.
Rose:       We have to start a new club.
                . . .
UCE-4252:   Okay. Now, now, help me understand. Why would you want to set up um a new, I mean, it will be a real club or --
Rose:       Yeah, I mean it could be. I mean the thing is, I mean the guy that, the client that wants to do that obviously has a lot of money so the question becomes if he doesn't want to be a partner, because he can't be. I mean it would make sense to, you know, he would have to be willing to set up shop a little bit. Not a tremendous amount of money but it would have to be wanting to set up shop to be able to do this.
UCE-4252:   Set up shop in terms of setting up the club?
Rose:       Yeah, let's say for example, and I'm just thinking out here because this is a little different than what we spoke about. Or this is just one client but if you have um, like he has a club for example which if you could buy for $250,000 to get in it. Depending on, and you could lay out the volume of cash that could flow through it, it would have to make feasible sense for the client to say, well that $250,000 would be a good way to get in it. If I could pay it in cash, that's cash under the table to pay to buy the club now you have the club and now you can use that club to run that, you know the rest of the cash through. And the way that you know we can get paid our fees are obviously he's not going to own anything, so one way of our fee is on initial start is the fact that we have business that's going to profit anyway. So we don't really care about you know any fee on his side until it catches up to the maybe the initial 50% of what he put up. So let's say he put up $250,000 to buy this club to put the money in. You know maybe once he's gotten his first, you know 300 or 400 or whatever maybe 500 through it, then we can start getting a little percentage on the money because then he would feel whole on his money and we'd have a club. We'd have an asset. That's just one way of thinking about it.

MICHAEL ROSE'S SENTENCING MEMORANDUM
No. 15-CR-0126-WHA                              40

(February 10, 2012 Recording at 01:11:30.) UCE-4252 expressed disinterest on behalf of his clients in an investment, suggesting that the money laundering scheme was the only option.

The February 10, 2012 meeting had two effects: the undercover learned what a big target Mike would be, and Mike learned just how *easy* the money would be. Money would be brought to him, he would deposit it in an account for a company he controlled, and he would pay it back out, minus a percentage fee. The undercover agent assured him it was low risk and he would not get caught. Mike also still believed the undercover agent's clients might become legitimate investors once they trusted him, which would resolve his clubs' financial hardships. Meanwhile, Mike struggled to find the cash to keep his clubs operating smoothly.

For two months, Mike continued to feel the pressure caused by his business reversals and the benefits being dangled by Government agents. Meanwhile, the primary undercover agent pressured Scalise and Handl to get Mike involved, despite their attempts to cut him out, reaffirming to them the importance of Mike's clubs in order for the enterprise to function at all:

UCE-4252:   I mean the thing is from my prospective I don't, you know, I don't care whether you own Club XS, a Club in Jacksonville or not. Mike's got, you know, Mike's got enough Clubs in enough places that make enough money that it will all look good and provide the client with everything he needs.

Scalise:   Hold on let me ask you this, Ravi. Why can't our concierge service be the one that you guys pay?

UCE-4252:   Well, I mean so the question is do we still get the convenience for this client to collect his Pineapple money in a bunch of different places and drop him off?

Scalise:   Yeah, we'll meet him at the Club.

UCE-4252:   Okay, so, no, well, that's what I'm saying. If Mike is on board with that, that that's all I'm asking, if Mike on board, we can probably still do this.

Scalise:   He is, this is the deal, he hasn't said yes or no. . . .

(April 5, 2012 01:19:27 PM Recording at 00:00:53-00:01:46.) In response to these continued inquiries, Mike justified his lack of commitment as being a product of his travel schedule, and

he attempted to buy time by trying to negotiate a higher cut. However, by April 2012, the need for cash overwhelmed his conscience, and he joined the enterprise.

Although Mike was motivated by making money, it was his businesses' financial crises, caused by his business partner's thievery and the opening of the new country music venue, which was the catalyst that caused him to commit to the money laundering scheme. The Government found Mike at precisely the right time to take advantage of this weakness. Mike says, "I remember, after finally deciding to join the illegal scheme, how I felt the very next day sitting on my couch. I realized that I just involved myself in something that could potentially harm my children." The first payment of clean money was made on June 7, 2012, and payments continued approximately twice per week until halting about ten months later on April 10, 2013.

Mike's financial distress only compounded by mid-2014. In September 2013, the undercover's clients, who Mike believed were members of a Latin American cartel, agreed to invest $200,000 in a new Gold Club in Las Vegas. The club failed, and the undercover agent seized the opportunity created by Mike's indebtedness. He met with Mike on May 13, 2014, and, although superficially referring to other launderers who also lost his clients' money in a failed investment, insinuated Mike could be in danger:

Rose:        Yeah, so, anyhow, what's been good with you, anything good?
UCE-4252:    You know when you feel stretched too thin?
Rose:        Yeah.
UCE-4252:    I'm sure you know that feeling.
Rose:        Are you still all over the place with these guys?
UCE-4252:    Yeah, I'm kind of all over the place. . . I just feel like there's a lot of people like hey I want to know about this. I want to invest in this. I'm like kind of running too many places. I got a couple of guys who went, I wouldn't say sideways, but they fucked up a little bit. . . . They took out investments, a loan from the pineapple guys and then they . . . Well, I don't want to say sideways cause they're not like ignoring me. They're very apologetic and trying to figure out how to fix this but--

| | |
|---|---|
| Rose: | Did they know those guys before? |
| UCE-4252: | No, no, no. |
| Rose: | Or are they just loan sharks? |
| UCE-4252: | No, I wouldn't say it was a loan shark. It was like, hey, you know, you front us this and we'll do our business and we'll give you an extra turn. |
| Rose: | Oh. Oh. |
| UCE-4252: | Yeah. |
| . . . | |
| Rose: | So these guys are really fucked right now. |
| UCE-4252: | They are a little fucked up, and the one thing I always want to make sure is nobody gets hurt under my clock. That is not the way I want, I am not that guy. I don't want any deal going like that, but I don't ever want it to get out of control to the point where someone takes it out of my hands. I don't want that. |

(May 13, 2014 Recording at 00:22:22-00:26:34.) From then on, Mike believed he was in physical danger if he did not pay back the client's investment, and Mike felt compelled to continue in order to appease them. "I couldn't sleep and lived with daily anxiety and stress over this unthinkable decision," Mike says. Unsurprisingly, the money laundering, which had stopped thirteen months earlier, resumed within a matter of weeks after this conversation, with the first return payment occurring on June 24, 2014.

The undercover agent then attempted to use this leverage to expand Mike's potential sentence. For years, Mike had told the undercover that he had no interest in the drug-dealing side, the "other side", of transactions. Undeterred, the undercover agent proposed the idea of finding law enforcement to serve as security for a drug transaction, starting in July 2014:

| | |
|---|---|
| UCE-4252: | Okay. Um, so, remember when you told me the story about you and, when uh, the big man Dave . . . so someone called David from work and said Mike is a friend of ours. |
| Rose: | Yeah. |
| UCE-4252: | Do you have friends like that, you trust? |
| Rose: | Yeah. |
| UCE-4252: | In the big man's line of work |
| Rose: | In that work? |
| UCE-4252: | Yeah. |
| Rose: | Yeah. |
| | . . . |
| UCE-4252: | So, given what our clients do -- |

| | |
|---|---|
| Rose: | Yeah. |
| UCE-4252: | Having people in Gaither's old line of work helps. |
| Rose: | Yeah. |
| UCE-4252: | There are various ways that they can help. It is worth a lot. |
| Rose: | Okay so, explain . . . so give me, like, the idea. |
| UCE-4252: | Okay so, for example, there are pineapple deals that happen and some of their presence can massively calm down a situation. It lets people know, um . . . |
| Rose: | So tell me. Why are you beating around the bush? |
| UCE-4252: | Okay, alright, alright. So there are things when we have--when we have cops on the payroll, there are things they can do and earn money. People who arrange them, trusted guys, can make money as well. |

(July 15, 2014 2:05 p.m. Recording at 00:28:40-00:36:15.) Mike demurred, still not interested in assisting with a drug transaction. The undercover followed up and pressed Mike to find security on August 8, 2014; September 11, 2014; November 2, 2014; and November 18, 2014. (August 8, 2014 Recording at 00:27:05-00:28:29; September 11, 2014 10:54 a.m. Recording at 00:17:05-00:18:04; November 2, 2014 1:57 p.m. Recording at 00:04:05-00:05:20; November 18, 2014 4:41 p.m. Recording at 00:00:50-00:03:00.) Despite his willingness to continue following the undercover's instructions in order to avoid putting himself and his family in danger, Mike still avoided, and did everything possible to avoid, involvement in and drug deals.

On February 24, 2015, the Government obtained a sealed indictment in this action based on the drug transaction the undercover organized for Handl. Mike was not named in the drug conspiracy. However, the Government did not immediately arrest the conspirators. Instead, the undercover agent tried one last time to ensnare Mike.

On March 8, 2015, Mike and UCE-4252 met for lunch in San Francisco, where Mike was staying on unrelated business. UCE-4252 told Mike for the first time about the scheduled "pineapple" transaction in Myrtle Beach, and Mike was shocked:

| | |
|---|---|
| UCE-4252: | I'll tell you the reason why but the--another quarter pounder will be delivered tomorrow. |
| Rose: | To Myrtle? Why is it going there? |
| UCE-4252: | Because of uh--Vlad is branching out. |

Rose:          He is? Tell me about this.
UCE-4252:      Um, he's been pushing for a long time to get the fruits. . . . And I told him for a long time, hey man--
Rose:          --That's the other side of the--
UCE-4252:      Hey man, that's a whole other game.
. . .
Rose:          He must have something going on the other side.
UCE-4252:      That's what I'm saying and the one thing that makes me wonder is he is ordering three full pineapples.
Rose:          Jesus Christ.

(March 8, 2015 1:26 p.m. Recording at 00:30:17-00:33:20.) Mr. Rose confirmed that he "would stay on the safe side," noting that he would "be scared to death" of being involved. (*Id.* at 00:37:22-00:37:32; 00:43:40-00:44:00.) Mr. Rose confirmed that funds that he would launder would be separate from the drug deal:

Rose:          But that's gonna be separate from anything else.
UCE-4252:      Oh, no, no, no, no, of course, separate, I mean a little bit faster because it is not being driven. So like, I don't exactly when that's happening but my guess is like let's say, they are done at 11:00 a.m. and like 4:00 in the afternoon we will meet at his club, you know, a break.
Rose:          A break.
UCE-4252:      Yeah, a break.
Rose:          Yeah, that'll work.

(*Id.* at 01:05:48-01:05:58.)

    UCE-4252 talked to Mike a week later on March 15, 2015, and told him to bring Gaither to their next meeting, planned for March 17, 2015. Mike stumbled to respond to UCE-4252's request, telling UCE-4252 that he "didn't know what [UCE-4252 was] talking about." (March 15, 2015 2:30 p.m. Recording.) UCE-4252 just told Mike that "when I see you in person, this will make a hundred times more sense. (*Id.*) Despite his confusion, Mike invited Gaither to the meeting per UCE-4252's instructions.

At a March 17, 2015 morning meeting in Myrtle Beach, UCE-4252 proposed the idea of security to Rose and Gaither together, and Gaither offered McGaha as security over Mike's protestations:

| | |
|---|---|
| UCE-4252: | So, uh, in general, if you guys could also keep an eye open for, if you think there is a security guard-- |
| Rose: | Oh I know. |
| UCE-4252: | Because-- |
| Rose: | We thought we had somebody but we were afraid to go to him, Reagan. |
| Gaither: | I think I may have another one now. |
| Rose: | Who? |
| Gaither: | McGaha. |
| Rose: | Our state trooper? |
| Gaither: | Cause, uh, his birthday I kind of walked in on him and he went, "Oh! I don't need no--" |
| Rose: | Oh, I know it, yeah. |
| Gaither: | I said you're good. So-- |
| Rose: | Oh you did? So 100% oh then, yeah. |
| Gaither: | Yeah. 100%. So I don't know for sure. |
| UCE-4252: | Did you guys actually approach him? Or you just didn't feel -- |
| Gaither: | I haven't yet. |
| Rose: | No, we haven't yet. Because we were trying, we didn't want to -- listen -- you know -- when you -- |
| UCE-4252: | No, I know. |
| Rose: | This is the deal. These are our friends that we know very well, and it wouldn't matter anyway, but you're just afraid to cross that line with a friend. . . . |

(March 17, 2015 11:22 a.m. Recording at 00:37:19-00:38:47.)

Even after this conversation, Mike confirmed with the undercover that he would not be involved in the drug transaction, asking, "the other thing is . . . I'm trying to figure out how to send it, because Vlad's going to be there . . . that side, and the money side." (*Id.* at 00:53:23.) UCE-4252 assuaged his concern by stating, "here's the thing. The fact that you guys are in the same room when the 250 shows up, at that time, it's all separate." (*Id.*) Mike and Gaither later discussed the specifics of McGaha's involvement. Nineteen hours after this conversation, based only on the events of March 17, Mike was arrested and charged with conspiracy to distribute

narcotics, carrying a ten-year statutory minimum sentence (although Mike has now qualified for safety valve relief).

As the Court rightfully noted in its October 19, 2015 Order, Mike Rose was not an innocent and naïve sap. He was an experienced businessman who willingly joined the enterprise at issue in order to make money to sustain his flailing businesses. But Mike Rose was also a lifelong law-abiding citizen, under enormous financial pressure and scared that he would soon be unable to feed his family and prevent his mother from losing her home, who was offered a criminal opportunity presented as minimal effort, minimal risk, and high profit by the Government. The Government found Mike at his own breaking point and enticed him with an offer just sweet enough to push him over the edge into criminality. Although Mike committed the crimes at issue, he never acted with a malicious intent; he acted only to preserve his businesses and ensure that he could continue to support his family and employees. Mike's motivation and the circumstances of Mike's offense demonstrate that a downward variance is appropriate for Mike Rose.

## V.   CONSIDERATION OF THE REMAINING § 3553(a) FACTORS CALLS FOR A SENTENCE OF TIME SERVED

In Sections III and IV of this Sentencing Memo, we discussed the history and characteristics of Mike Rose and the nature and circumstances of the offense, pursuant to § 3553(a)(1). We now turn to the remaining § 3553(a) factors.

### A.   Section 3553(a)(6)

Title 18 U.S.C. §3553(a)(6) directs that the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" be considered when imposing sentence. To this end, using a data collection maintained by the United States Sentencing Commission (USSC), MCM Data Consulting

(MCM) has prepared a Federal Sentencing Data Analysis (FSDA) Report at our request in order to determine how defendants similarly situated to Mike Rose were sentenced in federal courts across the country. MCM is a sentencing data consulting firm that collects and analyzes USSC data. The principals of MCM, Meredith Patti and Mary Cate Rush, formerly conducted all of the statistical sampling and analysis on federal sentences for the non-profit National Center on Institutions and Alternatives ("NCIA"). NCIA has been repeatedly recognized for its sentencing expertise in courts across the country.

MCM's FSDA Report, attached as Exhibit D, shows that, between Fiscal Years 2012 and 2015, 79.0% of all defendants pleading guilty who were sentenced under Guidelines §2B1.1 (Criminal History Category 1) and who, like Mike, received increases pursuant to § 2S1.1(b)(1)(i) and (b)(2)(B), received sentences below their Advisory Guidelines range. Of these defendants, 24.0% received a sentence of time served or probation. The average downward variance for the 79.0% of defendants who received sentences below their Advisory Guidelines range was 33.6 months below the Guidelines minimum, and the average sentence imposed is 29.5 months of imprisonment. The average sentence imposed for defendants who received variances to avoid unwarranted sentencing disparities pursuant to 18 U.S.C. § 3553(a)(6), as the probation officer recommends for Mike, is 25.9 months, with an average variance of 34.6 months.

As these statistics demonstrate, a sentence of time served is hardly unreasonable for Mike Rose or uncommon among similarly-situated defendants. Nearly four out of every five defendants whose Guidelines sentence was calculated based off their money laundering charge received a substantial downward variance, and the variance cuts the average sentence by over half from the Guidelines minimum.

Of course, there is no statutory requirement that the §3553(a)(6) disparity analysis be precise or rigid in nature. We seek to give the Court a general view of similarly situated defendants under a range of groupings and factors. Under any of these constructs, a sentence of time served is not extraordinary.

**B.      Section 3553(a)(2)(A)**

The Court must consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. The Court must apply these concepts to Mike Rose's specific situation and articulate its thinking in some fashion. The Court is permitted to weigh and discount these factors against other statutory factors that it is considering and to give different weights to different factors in the particular circumstances of Mike's case.

Laundering money believed to be drug proceeds is a serious offense by nature. However, as previously noted, the charged offenses here are completely out of character with Mike's life and were brought on by financial desperation. A sentence of time served will not set a precedent of leniency or disrespect the law; to the contrary, it would reflect the need for an individualized examination of Mike's personal history and character and the unique circumstances of the crimes he committed. During his period of supervised release, Mike will still be subject to substantial deprivations of liberty, which the Supreme Court has recognized to have punitive effect. *See Gall v. United States*, 552 U.S. 38, 48 (2007) ("Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."). Mike will be justly punished by a sentence of time served, as he will still be branded for life as a felon and will have to pay significant fines and penalties.

Mike has already been financially devastated, embarrassed, and ashamed by his conduct and resulting guilty plea. The circumstances of the offense, plus Mike's lifetime of good works to a wide circle of friends, family, employees, and fellow citizens, as well as the real care needed by his children and ailing mother, must be taken into account in determining the minimally sufficient, just sentence.

## C.    Section 3553(a)(2)(B)

The Court must consider the need for the sentence to afford adequate deterrence to criminal conduct. The Court is also permitted to weigh this factor against other factors that it is considering. For the same reasons noted above, a sentence of time served can serve the purpose of general deterrence in Mike Rose's case. Because of the unique circumstances of the crimes at issue, little precedential deterrent effect will be established by any sentence. A sentence of time served, particularly in light of all that has publicly and privately befallen Mike, will sufficiently send the message that Mike Rose has been punished.

## D.    Section 3553(a)(2)(C)

The Court must consider the need for the sentence to protect the public from further crimes by Mike Rose. Based on the information made available to the Court, there is no reason at all to believe that further incarcerating Mike is required in order to protect the public from any potential future crimes on his part. Mike is a first-time offender, and deserves to be recognized as such. The guilty plea itself, the experience Mike has gone through since being indicted, and his numerous acts of kindness and good works, exhibited over a lifetime, will undoubtedly insure that the public is protected.

As noted above, the conduct at issue here was entirely out of character with Mike's lifetime of good works. The financial stress Mike faced in early 2012 weighed heavily on his

decision-making and caused him to make an aberrant decision to join into the money laundering enterprise. Mike's crimes are clearly atypical of his character and his life as a whole. Moreover, the need to protect the public from Mike is minimal when the public was not actually harmed by Mike's crimes; far from being a danger, Mike is a proven benefit to the public, creating hundreds of jobs with his businesses and helping hundreds of disadvantaged children with his charity. The Court will be able to ensure Mike is not a risk to the public, as he is statutorily required to remain under the Court's supervision for years on supervised release. The suffering he has endured and caused for his family as a result of this case would be sufficient to deter him and protect the public for the remainder of his life.

### E.   Section 3553(a)(2)(D)

The Court must consider the need for the sentence imposed to provide Mike Rose with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. As for educational or vocational training, Mike does not require any provided by the federal prison system. He has been gainfully employed for all of his adult life and will have no problem staying employed in the future. In fact, a sentence of imprisonment will obviously interfere with Mike's gainful employment and extensive service to the community. Indeed, it is Mike who is needed to provide such care to his loved ones. Finally, there is no "other correctional treatment" required by Mike that the federal prison system can accommodate.

### F.   Section 3553(a)(3)

The Court must consider the kinds of sentences available for Mike Rose. These would, of course, include time served, home or community confinement, or a sentence of imprisonment, and restitution. Supervised release is statutorily required. We respectfully

submit that time served and supervised release would be appropriate for Mike under these circumstances. Mike is also ready and willing to make any community restitution payment ordered by the Court.

### G.     Section 3553(a)(4)(5)

As noted above, the Court must consult and consider applicable Guideline provisions and Guidelines Policy Statements, but is now permitted "to tailor the sentence in light of other statutory concerns as well." *Booker*, 543 U.S. at 245. "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however." *Gall*, 552 U.S. at 49. Under the *Booker-Gall-Kimbrough* line of cases, the Court is fully empowered to disagree with the Guidelines and Guidelines Policy Statements. The Ninth Circuit only requires that any such disagreement, and any deviation from the Guidelines range, must be acknowledged and explained by the sentencing court.

Over the past twenty years, the Sentencing Commission has dramatically increased the severity of sentences for defendants sentenced using the § 2B1.1 loss table by raising the number of points imposed for the amount of loss and by approving a five-fold expansion in the number of specific offense characteristics. Last year, the Sentencing Commission recognized the unduly harsh punishments caused by the loss table under § 2B1.1, stating that their revisions were meant to address "longstanding concerns that the guidelines do not appropriately account for harm to victims, individual culpability, and the offender's intent." Press Release, U.S. Sentencing Commission, U.S. Sentencing Commission Adopts Economic Crime Amendments, (April 9, 2015), available at

http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/press-releases/20150409_Press_Release.pdf. Although these revisions accomplished the goal of negating the disproportionate Guideline ranges for defendants subject to certain specific offense characteristics, they did nothing to change the overreliance on the loss table as a surrogate for culpability.

"As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts*, 69 (1998)). Due to the Commission's recognized failure to rely on empirical data in developing the loss table under § 2B1.1, sentencing courts have tremendous discretion to disagree, on policy grounds, with § 2B1.1's recommendations. *See Spears*, 555 U.S. 261, 264 (2009) (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"); *see also* U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: *An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 56 (Nov. 2004).

Mike faces a potentially harsh sentence of imprisonment under the Advisory Sentencing Guidelines due primarily to the Guidelines' mathematically rigid and empirically dubious loss-based formulas, which is calculated based on the total funds laundered over the multiple-year

period rather than the loss to any victim. Given the high amount of loss attributable to Mike, the loss table used to calculate Mike's Adjusted Offense Level results in a Guideline range that does not adequately reflect his individual culpability and benign intent, factors much more germane to Mike's minimally sufficient sentence than the total amount of money Mike laundered.

The Base Offense Level attributed to Mike is 24, which includes a 16-point increase because the total amount of funds laundered was approximately $2,635,000. This amount was not calculated improperly under the Guidelines, which includes "intended pecuniary harm that would have been impossible or unlikely to occur" as "loss." However, it is undeniable that Mike's crimes did not cause the same degree of pecuniary harm as, for example, a theft of the same amount from private individuals.

The Government was in full control of the amount of money it injected into the money laundering enterprise. In a traditional case under which the loss table under § 2B1.1 is applied, the victim of the harm has no control over the amount of harm being caused to him. With its relatively limitless resources, the Government delivered cash into the money laundering enterprise whenever it wanted for nearly three years. After the Government had Mike and Handl launder over a million dollars between June 2012 and April 2013, it stopped for fourteen months, yet it resumed deliveries with the same frequency fourteen months later in June 2014. The Government was able to choose the amount of loss it wanted to be attributable to Mike, and it decided on $2,635,000 before it switched its focus to the narcotics conspiracy.

The "loss" attributable to Mike does not reflect the pecuniary harm actually caused. The Government was not harmed at all; to the contrary, it merely budgeted money to be used by the undercover agents to keep the money laundering enterprise running. Moreover, the loss

attributed to Mike was calculated as the total amount of money the Government provided to Mike over this period, even though the Government received 92% of that money back shortly after Mike laundered it.

On the other hand, the profit Mike obtained from the money laundering enterprise was relatively minimal. Mike and Handl split an 8% fee on the laundered funds, so pursuant to the indictment, the total funds that Mike retained as his laundering fee over the entire period is $105,400. After subtracting their fees and expenses incurred as part of the delivery, Mike's actual profit was often much less than that.

As a result, Mike is attributed a high Base Offense Level even though neither the actual harm he caused nor the actual profits he received are anywhere near as high as the loss amount used to calculated that Base Offense Level. Put another way, the Advisory Guidelines "amount of loss" substantially overstates the seriousness of the offense in this particular case. It is not necessary for the Court to rely upon the total amount of money Mike laundered, the single number used to calculate his Base Offense Level, in its determination of the minimally sufficient sentence given Mike's circumstances. *See United States v. Corsey*, 723 F.3d 366, 381 (2nd Cir. 2013) (Underhill, J., concurring) ("Outside the context of Sentencing Guidelines calculations, intended loss is always less serious than actual loss, so its value as a proxy for seriousness of a crime must be carefully examined.").

### H.   Section 3553(a)(7)

The Court must consider the need to provide restitution, and community restitution is an option pursuant to U.S.S.G. § 5E1.1(d). Mike Rose is ready and willing to pay any amount of restitution, fine, or special assessment ordered by the Court, and Mike's history establishes that he is quite capable of working extraordinarily hard to earn money and achieve his goals. He

will be in a far better position to make restitution payments if he is out of prison and gainfully employed. While this factor alone may not warrant a downward variance, it is one of many factors that the Court can take into account in imposing a sentence.

**VI.    CONCLUSION**

We have sought to convince the Court that Mike Rose is worthy of a just and moderate sentence of time served. Mike Rose outside of prison is a threat to no one. His incarceration will truly serve no useful purpose and will deprive the community, as well as his friends and family, of a force for good.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotation omitted).

Should the Court agree that a just, reasonable sentence of time served is appropriate, *Booker*, *Gall*, and *Kimbrough* allow the Court to impose it. In fact, § 3553(a) directs that the sentencing court "shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection." (emphasis added). The Ninth Circuit cases implementing the *Booker-Gall-Kimbrough* line provide an appropriate procedural path for the Court to do so.

DATED: May 24, 2016.

Respectfully submitted,

        /s/
SOLOMON L. WISENBERG, ESQ., DC Bar No. 464867
DAN MCCOY, ESQ., SC Bar No. 80128
101 Constitution Avenue, N.W., Suite 900
Washington, D.C. 20001
Telephone: 202.689.2922
Attorneys for Defendants (Pro Hac Vice)
Michael Rose

## **CERTIFICATE OF SERVICE**

I hereby certify on the 24th day of May, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notice to all counsel of record in this matter.

_____/s/_____
SOLOMON L. WISENBERG, ESQ., DC Bar No. 464867
101 Constitution Avenue, N.W., Suite 900
Washington, D.C. 20001
Telephone: 202.689.2922
Attorneys for Defendants (Pro Hac Vice)
Michael Rose