BRIAN J. STRETCH (CABN 163973)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

LLOYD FARNHAM (CABN 202231)
ANDREW F. DAWSON (CABN 264421)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6973
    FAX: (415) 436-7234
    andrew.dawson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) NO. 15-CR-00126 WHA |
| Plaintiff, | ) |
| v. | ) UNITED STATES' SENTENCING REPLY MEMORANDUM |
| MICHAEL ROSE, | ) |
| Defendant. | ) Sentencing Hearing: |
| | ) May 31, 2016, 2:00 p.m. |

**I.   INTRODUCTION**

The government submits this reply memorandum in response to Defendant Rose's Sentencing Memorandum ("Rose Memorandum"). *See* Docket No. 449.

**II.   DEFENDANT ROSE WAS A WILLING CO-CONSPIRATOR AND DECLINED REPEATED OPPORTUNITIES TO WITHDRAW FROM THE CONSPIRACY.**

Defendant Rose concedes, as he must, that he was not entrapped by the government into committing the charges to which he has now pleaded guilty. *See* Rose Memorandum, at 2. Nevertheless, he argues that he "ensnar[ed]" by government agents into joining the conspiracy, and he

accuses the government of using its "leverage to expand Mike's potential sentence." *Id.* at 2, 43.  In sum, defendant argues that because he was caught in a reverse sting operation run by government agents, the applicable Guidelines range should be disregarded and this Court should not impose any custodial sentence.  Neither the law nor the facts supports such a significant variance from the Sentencing Guidelines.

### A. Defendant Willingly Chose to Launder $2.635 Million and Chose Never to Withdraw from the Conspiracy.

As described in testimony provided in the trial of John David McGaha, the investigation that ultimately grew to include Defendant Rose began as an investigation into public corruption and money laundering.  Trial Transcript, April 29, 2016, at 53.  Contrary to Defendant Rose's implication, it was not an operation designed to tempt law-abiding individuals to commit crimes.  The undercover agent ("UC") in the investigation testified at trial that the "most interesting targets in the case were these high-level Russian money launderers, which we estimated from one set of financial documents to have laundered $56 million." *Id.* at 55.  Indeed, one of Rose's co-conspirators, Peter Scalise, was believed to have contacts with the Russian money launderers, and the undercover agent testified that he hoped to make contact with those targets via Scalise.  *Id.* at 60.  Scalise also introduced the UC to Vladimir Handl, who subsequently invited Defendant Rose to meet the UC.  *Id.* at 58-61.  Trial testimony confirms that the investigation was a long-term effort to root out crime, and that targets were brought to the government's attention only by invitation of other co-conspirators.  In other words, the government did not set out to target Defendant Rose; Rose chose to join the ongoing conspiracy.

Throughout the investigation, the UC took steps to avoid sweeping in any innocent targets.  For example, when Scalise sought to involve unwitting individuals in the money-laundering scheme, the UC declined the offer because he was "not comfortable involving people who were unwitting or had no knowledge, and involve them in criminal activity.  Trial Transcript, April 29, 2016, at 58.  And while Defendant Rose suggests that the government went to great lengths to "ensnar[e] Mr. Rose," Rose Memorandum at 2, there is no dispute that on the very same day Defendant Rose chose to join the conspiracy, the UC made very clear that he was under no obligation to commit and could withdraw at any time.  As reflected in recordings previously cited by this Court, the UC told defendant Rose that "all

I want are people who want to do it," and "I don't want you to feel like you jumped on a train you can't get off. I am the guy who can stop that train." *See* Docket No. 304, at 9. The UC also told Rose that "if you want out, you let me know. If you decided this is not what you want, you let me know." *Id.* Given this context, Rose's claim that the UC later "insinuated Mike could be in danger" is not persuasive. Rose Memorandum, at 42. The UC could not have been clearer about the terms of Rose's participation: "if you want out, you let me know."

Moreover, the claim that agents continued the operation in order to "expand Mike's potential sentence" is incorrect. First, with respect to the drug conspiracy, the PSR's calculations rely not on the drug Guidelines, but rather on the money laundering Guidelines.[1] Thus, the type and quantity of drugs has no effect on the Guidelines calculation before this court. Second, with respect to the money laundering, the PSR applies a 16-level increase under USSG §2B1.1(b)(1)(I), which applies to a loss of more than $1,500,000 but less than $3,500,000. PSR ¶ 39. The total laundered funds—$2.635 million—is more than a million dollars above the threshold that triggers the 16-level increase. The investigation continued because the co-conspirators continued to introduce the UC to other targets who were predisposed to criminal behavior. David Gaither, Paul Fink, Dominic Grissett, Richard Bush, and John David McGaha were all brought to the government's attention by other co-conspirators between 2013 and 2015.

While defendant's Sentencing Memo does not specify a legal doctrine under which he believes the government's conduct entitles him to a lesser sentence, it appears to amount to an argument akin to sentencing manipulation. But the Ninth Circuit has provided clear guidance on what is necessary to show sentencing manipulation, and the facts of this case are inconsistent with such a conclusion. The Ninth Circuit has explained that, in the drug context, "'sentencing manipulation' occurs when the government increases a defendant's guideline sentence by conducting a lengthy investigation which increases the number of drug transactions and quantities for which the defendant is responsible." *United States v. Boykin*, 785 F.3d 1352, 1360 (9th Cir. 2015). "To prove sentencing manipulation, a defendant

---

[1] As with Defendant Handl, under the drug charges, the total offense level would be 27 after application of the 2-level reduction for the "safety valve" provisions, and the resulting guideline range would be 70 to 87 months.

US SENTENCING REPLY MEMORANDUM RE MICHAEL ROSE
NO. 15-CR-00126 WHA                              3

must show 'that the officers engaged in the later drug transactions *solely to enhance his potential sentence.*'" *Id.* (quoting *United States v. Torres*, 563 F.3d 731, 734 (8th Cir. 2009) (emphasis added)). The *Boykin* court favorably cites cases from other circuits, which have granted relief for sentencing manipulation in "only the extreme and unusual case" involving "outrageous governmental conduct." *Id.* at 1360 (quoting *United States v. Fontes*, 415 F.3d 174, 180 (1st Cir. 2005); *United States v. Beltran*, 571 F.3d 1013, 1018-19 (10th Cir. 2009)). While the Guidelines calculation before this Court does not rely on drug quantities, defendant suggests that the UC wrongfully pressured Rose into continuing the money laundering in June 2014. But the record before the Court demonstrates that the ongoing operation was not designed "solely to enhance" Rose's sentence. On the contrary, the investigation continued to bear fruit after that time, as Dominic Grissett, Richard Bush, and David McGaha all joined the conspiracy after that date. And as noted above, because the applicable Guidelines range was triggered at $1.5 million—far below the $2.635 million cited in the PSR—Rose cannot show that the later transactions were designed to enhance anyone's sentence.

**B.     Defendant's Abilities, Resources, and Community Support Do Not Support a Sentence of Time Served**

Defendant Rose's Sentencing Memo includes an impressive number of letters of support, and they reflect the Defendant's remarkable entrepreneurial skills and loyalty to his friends and family. These are no doubt honorable characteristics. The government notes, however, that the fact Defendant Rose chose to join an ongoing conspiracy that he believed related to international cocaine trafficking *despite* these remarkable skills and community ties makes his conduct more troubling, not less. Few defendants who come before this Court enjoyed the advantages that Defendant Rose had. Defendant Rose was a sophisticated businessman who knew exactly what he was getting into, and he knew the risks. Despite those risks, and despite the considerable skills and advantages that are demonstrated in the letters of support, Defendant Rose chose to engage in criminal activity.

The government does not dispute that Defendant Rose has previously been a productive member of society and a devoted friend and family member. These characteristics support sentencing him to the low-end of the Guidelines range. The fact that Defendant Rose has no previous criminal history is accounted for by his Criminal History category and incorporated into the proposed Guidelines range.

1  But to sentence Defendant Rose to time served—which even Defendant's memorandum concedes would
2  be an abnormally dramatic variance[2]—would not promote respect for the law or adequately deter
3  criminal conduct.  The government therefore submits that Defendant Rose should be sentenced to the
4  low end of the applicable Guidelines range.

**III.    CONCLUSION**

Under the applicable provisions of the Sentencing Guidelines, the factors of 18 U.S.C. § 3553(a) as applied to this defendant and this criminal conduct, the government requests that the Court impose a sentence that includes a custodial sentence at the low end of the guidelines as calculated and considered by the Probation Office, 87 months in custody.

DATED: May 27, 2016                            Respectfully submitted,

                                               BRIAN J. STRETCH
                                               United States Attorney

                                               ＿＿＿／s／＿＿＿＿＿＿＿＿＿
                                               LLOYD FARNHAM
                                               ANDREW F. DAWSON
                                               Assistant United States Attorney

---

[2] Defendant argues that, of similarly situated defendants who received a downward variance, the average variance was "33.6 months below the Guidelines minimum." Rose Memorandum, at 48.  Such a variance, applied to the PSR's calculation, would still result in a sentence of 53 months in prison. Defendant Rose's request for time served is dramatically below this average.